CPC INTERNATIONAL, INC., Plaintiff, Appellant,

v.

NORTHBROOK EXCESS & SURPLUS INSURANCE CO., Defendant, Appellee.

Nos. 91–1580, 91–1734.

United States Court of Appeals, First Circuit.

Heard Dec. 3, 1991.

Decided March 24, 1992.

Rehearing and Rehearing En Banc Denied April 15, 1992.

Memorandum on Denial of Rehearing May 13, 1992.

William H. Allen, Saul B. Goodman, William F. Greaney, J. Gregory Sidak and Covington & Burling, Washington, D.C., on brief for The American Petroleum Institute, The American Fiber Mfrs. Ass'n, The Chemical Mfrs. Ass'n, Intern. Business Machines Corp., and Olin Corp., amici curiae.

Philip J. McGuire with whom Charles L. Philbrick, Gleason, McGuire and Shreffler, Chicago, Ill., Stephen W. Miller, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., Kenneth P. Borden, Linda E. Buffardi, and Higgins, Cavanagh & Cooney, Providence, R.I., were on brief for appellee.

Thomas W. Brunner, Marilyn E. Kerst, Lon A. Berk, and Wiley, Rein & Fielding, Washington, D.C., on brief for Insurance Environmental Litigation Ass'n, amicus curiae.

Jerome P. Facher with whom Neil Jacobs, Michelle D. Miller, Linda Sandstrom Simard, Hale and Dorr, Boston, Mass., David L. Harris, Stephen H. Skoller, Lowenstein, Sandler, Kohl, Fisher & Boylan, P.C., Roseland, N.J., John F. Bomster, Mark O. Denehy, and Adler, Pollock, Sheehan, Inc., Providence, R.I., were on brief for appellant.

John A. MacDonald, Deputy Atty. Gen., with whom Robert J. Del Tufo, Atty. Gen., John F. Dickinson, Deputy Atty. Gen., Frank X. Cardiello, Deputy Atty. Gen., and Mary C. Jacobson, Deputy Atty. Gen., Trenton, N.J., were on brief for the State of N.J., amicus curiae.

Before CAMPBELL and TORRUELLA, Circuit Judges, POLLAK,* Senior District Judge.

LOUIS H. POLLAK, Senior District Judge.

In this diversity case an appeal has been taken from the order of the Rhode Island District Court granting summary judgment in favor of the defendant-appellee, Northbrook Excess and Surplus Insurance Co. (Northbrook), an Illinois insurance company, and against the plaintiff-appellant, CPC International Inc. (CPC).

CPC is a New Jersey-based, Delaware-incorporated, food and chemicals manufacturer which does business throughout the United States and in numerous foreign countries. CPC brought suit in a New Jersey state court for a declaratory judgment of coverage, under an excess comprehensive general liability (CGL) policy issued by Northbrook; CPC's object was to be reimbursed for the expenses incurred in paying compensation for, and remedying, damage caused by polluting chemicals that evidently had migrated from the land surrounding the Rhode Island plant of Peterson/Puritan Inc., a CPC subsidiary, to adjacent land, seriously compromising the local water supply. After removal to the District Court for New Jersey, the case was transferred to the District Court for Rhode Island. That court, having determined that New Jersey law governed the dispute, concluded that, on the facts before the court,

* Of the Eastern District of Pennsylvania, sitting by designation.

the CGL policy's pollution exclusion clause insulated Northbrook from liability to CPC. The clause, which bars coverage for discharges of pollutants except when such discharges are "sudden and accidental" (an exception strongly relied on by CPC), has been construed by judges of the New Jersey Superior Court (New Jersey's first instance court of general jurisdiction) and by two panels of the Superior Court's Appellate Division (New Jersey's intermediate appellate court) but not by the New Jersey Supreme Court. The grant of summary judgment in Northbrook's favor turned on the Rhode Island District Court's prediction that the New Jersey Supreme Court, when it considers the issue, will reject the reading of the "sudden and accidental" exception to the CGL pollution exception clause which the Appellate Division has adopted. The correctness of the district court's divination of New Jersey law is the dominant question presented on this appeal.

## I. *The History of the Litigation*

### A. *Events Leading Up to the Litigation*

In 1968, CPC acquired the Puritan Aerosol Company—a manufacturer of, *inter alia,* flea spray, hair spray, spot remover and oven cleaner—located on seventeen acres fronting on the Blackstone River in Cumberland, Rhode Island. Under CPC's auspices, Puritan Aerosol acquired a new name—Peterson/Puritan—but continued doing the same business at the same old stand. (At length, in 1987, CPC was to sell Peterson/Puritan to another company, Hi-Port Industries, Inc.).

In 1982, Lincoln, a town next door to Cumberland, sued Peterson/Puritan for contamination of the wells constituting Lincoln's water supply. The basis of the suit was a geohydrological study prepared for the Environmental Protection Agency (EPA) by Goldberg–Zoino & Associates (GZA), an environmental engineering firm, subsequent to the discovery, in 1979, of pollution in the Lincoln and Cumberland water supply systems. Lincoln's suit was settled in 1984 for $780,000—a sum paid by Northwestern National Insurance Company (Northwestern National), the carrier

which provided CPC with primary general liability coverage up to a $1,000,000 ceiling. Meanwhile, acting pursuant to the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, *et seq.*, EPA, in 1982, had advised Peterson/Puritan that it would have to clean up its act. This initiated a process of EPA–Peterson/Puritan investigation and negotiation that matured in May of 1987 in a consent order, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, (CERCLA), 42 U.S.C. § 9601 *et seq.*, which (1) identified Peterson/Puritan as the source of numerous hazardous substances migrating into the groundwater, and (2) committed Peterson/Puritan to conduct a Remedial Investigation/Feasibility Study (RIFS) as a predicate to necessary remediation. Some six weeks before the execution of the consent order, Northwestern National, CPC's primary liability carrier, had advised CPC and Northbrook, CPC's excess liability carrier, that the primary coverage of $1,000,000 was exhausted.

Thereupon, in a "reservation-of-rights" letter dated April 27, 1987, Northbrook advised CPC that it had no obligation to provide excess coverage. One of the grounds relied on by Northbrook was the policy's pollution exclusion clause, which bars liability for personal injury or property damage "arising out of the discharge ... of ... toxic chemicals ... or other ... pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge ... is sudden and accidental."

### B. *The Litigation*

#### (1) *The New Jersey phase:*

On July 21, 1987, CPC filed its complaint against Northbrook in the Superior Court for Bergen County, New Jersey. Alleging that "Peterson/Puritan has incurred and continues to incur expenses for which CPC has assumed liability with respect to both the Town of Lincoln and EPA claims," and further alleging that "Northwestern has stated that its policy limits have been exhausted," the complaint sought (1) a declaration of Northbrook's obligation to "pay in

full up to its policy limits [$25,000,000] all of CPC's ultimate net loss as defined by its policy with respect to the Town of Lincoln and EPA claims," and (2) damages "incurred to date by CPC or which may be incurred by CPC in responding to the claims by the Town of Lincoln and EPA up to Northbrook's policy limits," plus costs, etc. Northbrook, invoking diversity jurisdiction, promptly removed the suit to the District Court for New Jersey. Somewhat over a year later, CPC filed a motion for partial summary judgment; Northbrook countered with a motion to transfer the case to the District Court for Rhode Island, pursuant to 28 U.S.C. § 1404(a). In a bench opinion dealing with the transfer motion, Judge Bissell addressed the considerations which, under *Gulf Oil v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), give some content to the amorphous statutory standard ("for the convenience of parties and witnesses, in the interest of justice"), and concluded that transfer was appropriate. At the close of his opinion, Judge Bissell made the following observations with respect to the law to be applied:

> The choice of law considerations at this point are very much unresolved and accordingly would not weigh one way or the other in my view.

> As far as the interest in the community, however, is concerned, in this Court's view, the primary interest involved here is that of the State of Rhode Island in terms of the funding and expeditious consummation of cleanup and its interest in the pollution of its waters generally. Indeed, I think it can well and clearly be said that Rhode Island has an interest in having insurers promptly accept responsibility for their obligations, if any, particularly when those obligations, if they exist, will promote the assistance to the environment of the State of Rhode Island. Those considerations are perhaps a little bit ethereal and may vary from case to case, but they are not to be ignored.

> To be sure, New Jersey has an interest as well in having its insured receive the benefit of its bargain. However, if under choice of law principles it turns out that New Jersey law is selected for purposes of construction of the insurance contract and the scope of the responsibility of the Defendant, our sister court in Rhode Island is just as capable as this Court would be in analyzing, construing and applying New Jersey state law on that point.

Accordingly, on February 27, 1989, venue shifted from the District of New Jersey to the District of Rhode Island.

#### (2) *The Rhode Island phase*
#### (a) *Choice of Law*

Following transfer to Rhode Island, CPC filed a motion for a declaration that New Jersey substantive law governed the controversy. Northbrook, in response, contended that the law of Rhode Island, the site of the pollution, or, in the alternative, the law of Illinois, the state in which the insurer accepted the risk, should apply. On June 21, 1990, the district court filed an opinion ruling on the choice-of-law issue.

Citing *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 821, 11 L.Ed.2d 945 (1964), the district court stated that "[t]his Court must apply the law of the state which would have been applied had the change of venue not occurred." [1] *CPC In-*

---

1. In *Van Dusen v. Barrack,* the Supreme Court said, at the page cited by the district court (376 U.S. at 639, 84 S.Ct. at 821 [footnote omitted] ):

> We conclude, therefore, that in cases such as the present, where the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue. A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms.

In the instant case, the district court, as a preface to carrying out its *Van Dusen v. Barrack* inquiry into whether a New Jersey court would apply New Jersey law, Rhode Island law, or Illinois law, ventured the following observations about the relevant substantive rules of insurance law in the three jurisdictions (739 F.Supp. at 713):

> Although the law of Illinois and New Jersey appears to be the same on the issues involved here, the absence of any substantial law in Rhode Island on the issue of environmental contamination insurance creates a potential conflict. *See id.* at 6 [713]. Both Illinois and New Jersey liberally protect their insureds by

*ternational Inc. v. Northbrook Excess & Surplus Insurance Co.* 739 F.Supp. 710, 713 (D.R.I.1990). The district court found no compelling reason why Rhode Island law should be applied: "[T]his case involves Rhode Island only because the contamination arose here. . . . Using the place of pollution approach will prove impractical in any case where the insurance policy in question provides for national or worldwide coverage." *Id.* at 713–14. With respect to the choice between Illinois law and New Jersey law, the district court observed that:

> In this kind of a case where the parties and their agents have ties to three states [New Jersey; Illinois; and New York, where an insurance broker was located] and where the environmental contamination giving rise to the dispute arose in a fourth state, it would appear more reasonable to apply the law of the one state which connects all of the parties together. . . . Furthermore, the body of law which has arisen from the environmental contamination problem addresses two concerns: 1) rectifying the harm to the public caused by environmental contamination and 2) protecting the interest of the insureds. The contacts with Illinois do not address either of those considerations. New Jersey, on the other hand,

has a strong public interest in protecting its resident insureds. Therefore, this Court concludes that a court sitting in New Jersey would interpret this insurance contract with this factual backdrop in accordance with New Jersey law.

*Id.* at 715.

Northbrook sought reconsideration of the district court's determination that New Jersey law would govern the controversy. In the alternative, Northbrook asked the district court to certify the choice-of-law question to this court. CPC countered by moving for summary judgment. The district court denied reconsideration and refused certification. Then Northbrook cross-moved for summary judgment.

#### (b) *Summary Judgment*

The district court, on March 15, 1991, denied CPC's summary judgment motion and granted Northbrook's cross-motion for summary judgment. *CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co.*, 759 F.Supp. 966 (D.R.I.1991). On April 29, 1991, the district court denied CPC's motion to alter or amend the March 15 judgment. On this appeal, CPC challenges the grant of Northbrook's summary judgment motion and the denial of the mo-

---

providing that any ambiguities in insurance policies must be resolved in favor of the insured. *Compare United States Fidelity and Guar. Co. v. Specialty Coatings Co.*, 180 Ill. App.3d 378, 129 Ill.Dec. 306, 310, 535 N.E.2d 1071, 1075 (1989) *with Kopp v. Newark Ins. Co.*, 204 N.J.Super. 415, 499 A.2d 235, 237 (1985). Illinois and New Jersey, likewise, interpret the "sudden and accidental" provision of the pollution exclusion clause (the clause at issue in this case) by considering the intent, expectation, and foresight of the insured. *Compare United States Fidelity, supra*, 129 Ill. Dec. at 312, 535 N.E.2d at 1077 *and Reliance Ins. Co. of Illinois v. Martin*, 126 Ill.App.3d 94, 81 Ill.Dec. 587, 589–90, 467 N.E.2d 287, 289–90 (1984) *with CPS Chem. Co. v. Continental Ins. Co.* 199 N.J.Super. 558, 489 A.2d 1265, 1268, 1270 (1984), *rev'd on other grounds*, 203 N.J.Super. 15, 495 A.2d 886 (1985) *and Jackson Township Mun. Utilities Auth. v. Hartford Accident and Indem. Co.*, 186 N.J.Super. 156, 451 A.2d 990, 994 (1982).

Although one appeals court in Illinois departs from the consensus and interprets "sudden" as temporal and instantaneous, that particular case involved active dumping of toxic chemicals on the insured's property. *International Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.*, 168 Ill.App.3d 361, 119 Ill.Dec. 96, 100–01, 106–07, 522 N.E.2d 758, 762–63, 768–69 (1988). A subsequent court differentiated its case from *International Minerals* and applied the intentional or expected test to the "sudden and accidental" phrase. *United States Fidelity, supra*, 129 Ill.Dec. at 312, 535 N.E.2d at 1077.

The facts here more closely resemble *United States Fidelity* and *Reliance* which interpreted sudden and accidental by considering the intent to cause the harm rather than the time frame in which the harm occurred. The case at bar does not involve allegations of actual dumping of hazardous chemicals on land. The allegations against Peterson Puritan were that contamination arose from leaks in its chemical storage tanks. As between Illinois and New Jersey it would appear that no conflict in applicable law exists. Since the absence of Rhode Island law on the subject creates a potential conflict, this Court must still determine which states' [*sic*] law should apply.

tion to alter or amend. As a predicate for assessing the correctness of the grant of summary judgment in favor of Northbrook, we will examine the district court's March 15 opinion in some detail.

### i. The Opinion Granting Summary Judgment in favor of Northbrook

### (A). The factual record and the language of the insurance policy

After describing the genesis of the litigation, the district court outlined the evidence adduced in discovery that tended to establish the circumstances giving rise to the flow of contaminants from the Peterson-Puritan site into the Lincoln-Cumberland aquifer:

> To the extent that information is available concerning the source of the contamination, the facts are essentially undisputed by the parties. No scientist or other expert who investigated the Peterson/Puritan facility was able to state unequivocally and precisely what caused the contamination that emanated from the site. But the two hydrogeologic surveys prepared following investigations of the area's aquifer (offered as exhibits by CPC and cited by Northbrook in its "Statement of Undisputed Facts") developed similar theories as to the possible causes of the pollution.

> The GZA report, commissioned by the EPA, was aimed at discovering the party responsible for the contamination. As to Peterson/Puritan, that report concluded:

>> Inasmuch as GZA did not have complete access to the property during the current study, the specific mechanisms of contaminant entry into the aquifer could not be thoroughly investigated. However, a number of possibilities exist, including direct leakage from floor drains and/or sewer lines within the plant through the unsaturated zone to the water table; runoff of contaminated fluids from the paved areas of the property; or direct discharge of effluent to Brook A via the aforemen-

tioned pipes and subsequent infiltration into the aquifer.

>> It should be noted that discussion of potential specific contaminant sources within the Peterson-Puritan property or elsewhere in the industrial area must be based partially on speculation. In this context, there is also the possibility of a past incident (e.g. a spill, leak, or discharge of contaminated fluids) representing the source of the aquifer contamination. Peterson-Puritan's original plant was destroyed by fire in 1976, thus no records of any such incident exist. It has been reported that, prior to 1974, the plant employed an on-site disposal system for sanitary waste and discharged process wastewaters to the Blackstone River. Depending on the nature of the discharge an disposal systems, the potential for ground water contamination may have existed while these systems were in operation.

> GZA report, page 40.

> The second report was prepared for CPC in 1982 and 1983 by environmental engineers, Malcolm Pirnie, Inc., ("Pirnie report"). In addition to investigating other potential responsible parties in the area, the report was geared to identifying possible sources of contamination within the plant. The Pirnie report concluded:

>> The heavy concentration at the plant, contrasted with the broader area of contamination (and the variation of VOC [volatile organic chemicals] concentrations within this area), tend to support the theory that several distinct events—occurring at different times—and from different sources at the plant, led to the release of VOCs to the ground. Indeed, the varying mix of VOCs found in the monitoring wells indicate that the heavy contamination at the plant may have been due to the more recent release of chemicals separate from the discharges which may have led to the contamination in the more downgradient portions of the aquifer. The multiple source aspect is further supported by the presence of elevated VOC levels

at well GZ–2, perhaps due to past discharges to the brook running along the property. The clustering of sources at the plant, and the fact that contaminants begin to migrate once released to the saturated zone, has made precise identification of responsible sources difficult.

Pirnie report, page VII–13 (original emphasis). Possible sources cited by the report include leakage from the backyard septic system, the storm water discharge pipe which emptied into the nearby brook, floor drains and associated piping, the vacuum pump flush water, and the fire and explosion at the plant in 1976. Pirnie report, pages VII–7—VII–12.

Beyond the reliance on these two reports, CPC offers no further evidence nor does it advance any other theory as to the source of the contamination. However, Northbrook, during the discovery phase of this suit, deposed several Peterson/Puritan employees. Their testimony about practices at the plant supports the hypotheses of the environmental engineers.[2]

759 F.Supp. at 967–68.

The district court completed its factual recital by setting forth the principal pertinent provisions of the CPC–Northbrook CGL policy: the description of coverage;[3] the definitions of "Property Damage"[4] and "Occurrence,"[5] and the pollution exclusion

2. The district court compendiously summarized the deposition testimony of Peterson/Puritan employees:

The employees described a system of drains on the plant floor used to flush away the chemicals that were frequently leaked or spilled during regular operations. Before 1972 when the plant hooked up to the Blackstone Valley sewer system, these drains led to pipes which emptied into a leaching field behind the plant. Often a remnant or "heel" (less than a full batch) of chemicals would be flushed down the floor drains, if it were a small amount, such as fifty to sixty gallons. Larger amounts would be poured into drums, transported to the leaching field and dumped. The plant had a storm water system of culverts and roof drains that discharged into the brook on the northern end of site. Around 1975, Frank King, foreman for building and machine maintenance, discovered that process wastewater from the production line, filters and filling machines was being flushed into the storm water system, carrying waste chemicals with it. Mr. King terminated the practice, but estimated that it might have been going on for as long as five years. Between 1965 and 1975, chemicals were delivered and stored in storage tanks on a concrete pad outside of the plant. Leaks, drips and spills from these tanks were virtually continuous. In 1975 or 1976, over 5,000 gallons of a chemical (perchloroethylene) spilled when a railroad car pulled away while still hooked up to the tank. Chemicals spilled in this manner would go under the concrete or over the edge of the pad into the soil. The floor drains, storm water system and chemical tank farms spills are only a few of the potential pollution sources described by the Peterson/Puritan employees deposed by Northbrook.

Peter Roncetti, manager of regulatory affairs for CPC who was sent in to oversee EPA compliance at Peterson/Puritan, stated when he was deposed, "I believe most likely a number of sources [were responsible for the contamination] rather than a single event. But this is a judgment. There's nothing definitive in those determinations made by ourselves or our consultants." Deposition of Peter Roncetti, page 94. Mr. Roncetti goes on to say that, with the exception of the aforementioned 5,000 gallon spill of perchloroethylene, he has found no indication of any other major spill at the plant (p. 94), and that while the major explosion in 1976 may have caused some spills, it did not appear to result in "any major loss of bulk chemicals from tanks." (p. 96). 759 F.Supp. at 968–69.

3. The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability

A. imposed upon the Insured by law, or
B. assumed under contract or agreement by the, Named Insured,
for damages on account of
A. Personal Injuries
B. Property Damages
C. Advertising Liability,
caused by or arising out of each Occurrence happening anywhere in the world.

4. "Property Damage" shall mean loss of or direct damage to or destruction of tangible property (other than property owned by any Insured) and which results in an Occurrence during the policy period.

5. "Occurrence" means an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury, Property Dam-

clause.[6]

### (B) *Determining the New Jersey rule and applying the rule*

The district court's discussion of law began with a summary of the standards governing summary judgment. Then the district court listed the "disputed issues":

> Many issues, factual and legal, are disputed between CPC and Northbrook. For example: Was there an "Occurrence," as defined by the policy? Did the "Occurrence" take place during the one-year policy period, July 1979 through July 1980, when CPC was insured by Northbrook? Does payment of response costs pursuant to an EPA order constitute compensable "damages" under the policy? Was the contamination intentional? When was Northbrook notified of CPC's claim in connection with the EPA order? Is Northbrook liable for the settlement with the Town of Lincoln even though the amount paid was within the coverage limits of CPC's primary insurer, Northwestern National?

759 F.Supp. at 970.

Thereupon the district court noted that "[t]o be compensated under the policy for

both claims (the Town of Lincoln claim and the EPA-related claim), all the disputed issues must be decided in CPC's favor.... Consequently all the threshold issues posed by the above questions will be resolved in such a way as to bolster CPC's claim for coverage under the insurance policy." *Id.* at 970–71. Thus, through the prism of Northbrook's summary judgment motion, the district court placed in focus the dominant question of law presented to the district court and to this court: on the factual record summarized by the district court, is CPC barred from recovery as a matter of law by the insurance policy's exclusion of liability for "the discharge ... of ... toxic chemicals ... or other ... pollutants," or could a fact-finder determine that "such discharge" was "sudden and accidental"?[7]

Because the question is one of New Jersey law, the district court commenced the legal inquiry by referring to five New Jersey opinions construing the pollution exclusion clause.[8] Three of these are trial court—i.e., Superior Court—opinions handed down between 1975 and 1984.[9] Two are intermediate appellate—i.e. Appellate Division—opinions handed down in 1987 and 1988.[10] The soundness *vel non* of these

---

age or Advertising Liability neither expected nor intended from the standpoint of the Insured.

**6.** This policy shall not apply
I. to Personal Injury or Property Damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

**7.** For the full text of the pollution exclusion clause, see note 6, *supra*.

**8.** The pollution exclusion clause appears to have been a standard ingredient of CGL policies since the early 1970s. According to New Jersey's Appellate Division: "Before 1966, the standard policy covered only property damage and personal injury 'caused by accident'.... In the 1966 revision, the insurance industry switched universally to 'occurrence based coverage'.... The pollution exclusion clause was added by the 1973 revision." *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co. of N.Y.*, 218 N.J.Super. 516, 528 A.2d 76, 84 (A.D.1987). According to

the Third Circuit, which has recently canvassed the same ground, insurance industry representatives were presenting, and explaining, the new pollution exclusion clause to state insurance officials as early as 1970. *New Castle County v. Hartford Acc. and Indem. Co.*, 933 F.2d 1162, 1197–98 (3d Cir.1991). What these CGL drafting shifts signified is discussed in text and footnotes *infra* at notes 31 and 32 and notes 43, 44 and 45.

**9.** *Lansco, Inc. v. Department of Environmental Protection*, 138 N.J.Super. 275, 350 A.2d 520 (Ch.Div.1975), *aff'd.* 145 N.J.Super. 433, 368 A.2d 363 (A.D.1976), *certif. denied* 73 N.J. 57, 372 A.2d 322 (1977); *Jackson Township Municipal Utility Authority v. Hartford Accident & Indem. Co.*, 186 N.J.Super. 156, 451 A.2d 990 (Law Div.1982); *CPS Chem. Co., Inc. v. Continental Ins. Co.*, 199 N.J.Super. 558, 489 A.2d 1265 (Law Div.1984), *rev'd.* on other grounds, 203 N.J.Super. 15, 495 A.2d 886 (A.D.1985).

**10.** *Broadwell Realty Services, Inc. v. Fidelity & Gas Co. of N.Y.*, 218 N.J.Super. 516, 528 A.2d 76 (A.D.1987); *Summit Assoc., Inc. v. Liberty Mut. Fire Ins. Co.*, 229 N.J.Super. 56, 550 A.2d 1235 (A.D.1988).

five opinions as harbingers of how the New Jersey Supreme Court will ultimately construe the pollution exclusion clause is of central importance in assessing the correctness of the district court's grant of summary judgment in the carrier's favor. Accordingly, we will consider these five New Jersey opinions with some care before summarizing the balance of the district court's opinion.

### (a) The New Jersey case law referred to by the district court

#### (i) The three Superior court opinions

The three Superior Court cases involving the pollution exclusion clause arose in similar settings but before three different judges. The three judges approached the issues in similar fashion and arrived at similar conclusions:

In the first case, *Lansco, Inc. v. Dept. of Environmental Protection,*[11] "a person or persons unknown"[12] deliberately released oil from the insured's tanks. Judge Gelman, sitting in chancery, ruled that (a) the discharge and resultant damage constituted an "occurrence" within the meaning of the CGL policy and was not excluded from coverage by the pollution exclusion clause, and (b) therefore the carrier had to indemnify the insured for clean-up costs mandated by the state environmental agency:

> "Sudden" means happening without previous notice ... unforeseen.... "Accidental" is defined as happening unexpectedly.... Further, under the definition of "occurrence" contained in the policy, whether the occurrence is accidental must be viewed from the standpoint of the insured, and since the oil spill was neither expected nor intended by Lansco, it follows that the spill was sudden and accidental under the exclusion clause even if caused by the deliberate act of a third party.[13]

In the second case, *Jackson Township Municipal Utilities Authority v. Hartford Accident & Indemnity Co.*[14] the question was whether CGL carriers had a duty to defend the Jackson Township Municipal Utilities Authority against claims alleging that the Utilities Authority had deposited toxic wastes in a municipal landfill, to the detriment of the groundwater of adjacent landowners. Judge Havey, of the Ocean County Superior Court, noted that ambiguous policy language is construed against the carrier and that exclusions from coverage are strictly construed.[15] Finding ambiguity in the policy language, Judge Havey ruled:

> [T]he [pollution exclusion] clause can be interpreted as simply a restatement of the definition of "occurrence"—that is, that the policy will cover claims where the injury was "neither expected nor intended." It is a reaffirmation of the principle that coverage will not be provided for intended results of intentional acts but will be provided for the unintended results of an intentional act.[16]

The third case, *CPS Chemical Co., Inc. v. Continental Insurance Co.,*[17] was substantially a repetition of *Jackson Township.* A chemical company which had contracted with a waste disposal company to have the latter dispose of chemical wastes sought a declaratory judgment that its CGL carriers were obligated to defend it against suits arising out of the deposit of the waste materials in a landfill. In ruling against the carriers, Judge Landau, of the Essex County Superior Court, expressly adopted the construction of the pollution exclusion clause formulated by Judge Havey in *Jackson Township*—i.e., " 'a restatement of the definition of "occurrence" ' " and " 'a reaffirmation of the principle that coverage will not be provided for intended results of intentional acts but will be provided for the unintended results of an in-

---

11. 350 A.2d 520, *supra,* note 9.

12. *Id.* at 521.

13. *Id.* at 524.

14. 451 A.2d 990, *supra,* note 9.

15. *Id.* at 992.

16. *Id.* at 994.

17. 489 A.2d 1265, *supra,* note 9.

tentional act.' " [18] Moreover, Judge Landau pointed out "that ambiguities in insurance policies are resolved against the carriers which drafted them," [19] and that although the drafters of the pollution exclusion clause may have "believed that 'sudden and accidental' connoted a sense of a dramatic catastrophe, limited in duration and immediate in its consequences ... it cannot fairly be said that this was unambiguously expressed." [20]

### (ii) *The two Appellate Division opinions*

The first case in which the Appellate Division had occasion to address the pollution exclusion clause in a reported opinion [21] was *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.* [22] The facts in *Broadwell* were these: Globe Petroleum (Globe) rented from Broadwell Realty (Broadwell) certain acreage on which Globe operated a gas station. New Jersey's Department of Environmental Protection (DEP) determined that gasoline had leaked from underground tanks at the gas station and seeped into adjacent properties. Thereupon DEP directed Broadwell to take steps both to clean up the contaminated areas and to prevent further seepage. These mandated procedures—which included the digging of an "interceptor trench" and a "recovery/pumping well" on Broadwell's own land—cost Broadwell approximately $50,000. Broadwell, as an additional insured on a CGL policy issued by Fidelity & Casualty Company of New York (Fidelity) to Globe, then sought reimbursement from Fidelity. When Fidelity denied coverage, Broadwell brought suit in the Essex County Superior Court. That court granted summary judgment in Broadwell's favor.

On appeal to the Appellate Division, Fidelity principally relied on the pollution exclusion clause and on a clause denying coverage for "property damages to ... property owned ... by ... the insured." With respect to the latter defense, Judge Baine, writing for the court, held that "the costs of preventive measures taken by Broadwell on its own property in response to the DEP directive which were designed to abate the continued flow of contaminants on to adjacent lands are recoverable under the policy;" [23] however, Judge Baine and his colleagues concluded that remand was required to determine whether all the mandated on-site procedures were in fact for abatement rather than for repair of damage done to Broadwell's own property. With respect to the pollution exclusion clause, the court stated that "[w]here the insured has taken reasonable precautions against contaminating the environment and the dispersal of pollutants is both accidental and unforeseen, we are of the view that the 'sudden and accidental' exception to the exclusion is applicable and the loss is thereby covered by the policy." [24] Further, "[w]e thus construe the word 'sudden' as meaning unexpected and unintended." [25] Finding that on the "meager [summary judgment] record ... substantial factual questions exist as to whether the pollution exclusion, as construed, bars recovery," [26] the court concluded that remand was necessary on this issue as well. [27]

What is important for present purposes is to consider the way in which the *Broadwell* court developed its construction of the pollution exclusion clause. The court's analysis of the pollution exclusion clause began with its characterization of Fidelity's position—"that the word 'sudden' has a temporal meaning and that the exclusionary clause thereby bars recovery for losses

---

18. *Id.* at 1270.

19. *Id.*

20. *Id.* at 1270–71.

21. *Cf. infra,* note 48.

22. 218 N.J.Super. 516, 528 A.2d 76 (A.D.1987).

23. *Id.* at 81.

24. *Id.* at 86.

25. *Id.*

26. *Id.*

27. The trial court was also instructed to address, on remand, Fidelity's claim that "the 'occurrence' did not take place during the policy period." *Id.*

caused by pollution except where the damage is the result of an unexpected and instantaneous catastrophe." [28] The court then noted that this position had been rejected in the Superior Court opinions canvassed above—*Lansco, Jackson Township,* and *CPS Chemical.* "In these cases, our courts have construed the word 'sudden' in terms of an 'unexpected,' 'unforeseen' or 'fortuitous' event. This definition is consistent with the common meaning of the word in everyday parlance." [29] The Appellate Division then cited a number of non-New Jersey cases, observing that while those cases reflect "some degree of disarray in the decisional treatment of this issue, the reasoning expressed in [the Superior Court cases] represents the prevailing view in other jurisdictions." [30]

Next—examining case law and scholarly commentary—the *Broadwell* court explored the evolution of the CGL's occurrence and pollution exclusion provisions:

> Before 1966, the standard policy covered only property damage and personal injury "caused by accident...." The courts generally defined "accident" as "an unexpected happening without intention or design...." Under this test, a volitional act by the insured nevertheless qualified as an "accident" if the insured did not specifically "intend to cause the resulting harm or [was] not substantially certain that such harm w[ould] occur...."
>
> In the 1966 revision, the insurance industry switched universally to "occurrence-based coverage." ... This change was "in response to consumer demands for broader liability protection and in acquiescence to the judicial trend toward a more expansive reading of the term accident...." The standard occurrence-based policy defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which re-

sults in bodily injury or property damage neither expected nor intended from the standpoint of the insured...." This definition was designed to "make it clear that occurrence embraces not only the usual accident, but also exposure to conditions which may continue for an unmeasured period of time."

> The pollution exclusion was added by the 1973 [31] revision. Under this exclusion, only pollution-related losses that arose from occurrences both "sudden" and "accidental" were to be covered.... Although it has been argued that the sole object of this clause was to limit coverage to accidents distinct in time and place, Note, "The Pollution Exclusion [Clause] Through the Looking Glass," *supra,* 74 *Geo.L.J.* at 1242, the more reasonable conclusion is that the exclusion was designed to "eliminate coverage for damages arising out of pollution or contamination, where such damages appear to be expected or intended on the part of the insured and hence are excluded by definition of 'occurrence.'" 3 *Long, The Law of Liability Insurance, supra,* App.–58.

> .    .    .    .    .

> Against this backdrop, decisional law in New Jersey and elsewhere has tended to interpret the pollution exclusion and, more particularly, the "sudden and accidental" exception, as "simply a restatement of the definition of 'occurrence'—that is, that the policy will cover claims where the injury was 'neither expected nor intended.'" *Jackson Tp. Etc. v. Hartford Acc. & Indemn. Co., supra,* 186 *N.J.Super.* at 164, 451 A.2d 990.... It is a reaffirmation that coverage will not be provided for expected and hence avoidable results.

We agree with this analysis.[32]

---

**28.** *Id.* at 83.

**29.** *Id.*

**30.** *Id.* at 83–84.

**31.** As pointed out in note 8, *supra,* the Third Circuit, in its recent canvass of the provenance of the pollution exclusion clause in *New Castle*

*County v. Hartford Accident & Indemnity Co.* traces the insurance industry's unfurling of the pollution exclusion clause back to 1970.

**32.** 528 A.2d at 84–85. With a view to achieving some compression of these extended excerpts from *Broadwell,* the names and citations of many of the cases and scholarly works quoted from or referred to have been omitted.

In the closing paragraphs of *Broadwell,* the Appellate Division noted the benefits of the analysis it had adopted. Coverage would be accorded to the deserving "insured [who] has taken reasonable precautions against contaminating the environment and the dispersal of pollutants is both accidental and unforeseen."[33] And problems of proof would be eased: "If the word 'sudden' is defined as 'rapid' or 'instantaneous,' how is the exclusion to be applied to the abrupt escape of a pollutant from a fissure in a tank caused by a gradual corrosive process?"[34] Then the court said:

> More important, our interpretation of the exclusionary language best advances the objectively reasonable expectations of the insured. As we have pointed out, the pollution exclusion had its genesis in the 1973 industry-wide revision. Even when considered within the context of our litigious society, it can fairly be said that the exclusion has generated an extraordinary number of lawsuits. We have alluded previously to the disarray in the decisional treatment of this issue. The question continues to confound scholars and commentators. The critical circumstance is that the ambiguity and confusion was caused by the language selected by the insurer. We necessarily considered the fact that "alternative or more precise" wording, if used, "would have put the matter beyond reasonable question." *Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, supra,* 35 N.J. [1] at 7, 170 A.2d 800. The ambiguity thus created must be resolved against the insurer.
>
> We thus construe the word "sudden" as meaning unexpected and unintended.[35]

In 1988, a year after *Broadwell,* the pollution exclusion clause returned to the Appellate Division in *Summit Associates, Inc. v. Liberty Mutual Fire Insurance Company.*[36] Citing *Broadwell* and the Superior Court's decision in *Jackson Township, supra,* the court said:

> As for Liberty's claimed insulation from liability by way of the pollution exclusion, our courts have consistently interpreted that exclusion to constitute the equivalent of an occurrence and to eliminate coverage only where such damages appear to be expected or intended on the part of the insured.[37]

(b) *The district court's prediction of the rule the New Jersey Supreme Court would adopt*

The district court, after referring to the three Superior Court and two Appellate Division cases we have just summarized, examined the question of how a federal court sitting in diversity is meant to carry out the mandate of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to find state law. In particular, the district court discussed the method to be pursued by a federal court when the highest court of the state has not addressed the disputed issue of state law. The district court quoted the following pertinent language from the Supreme Court's opinion in *Commissioner of Internal Revenue v. Estate of Bosch:*[38]

> Moreover, even in diversity cases this Court has further held that while the decrees of "lower state courts" should be "attributed some weight ... the decision [is] not controlling ..." where the highest court of the State has not spoken on the point. And in *West v. A.T. & T. Co.,* 311 U.S. 223, 237 [61 S.Ct. 179, 183, 85 L.Ed. 139] (1940), this Court further held that "an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the high-*

**33.** *Id.* at 86.

**34.** *Id.*

**35.** *Id.*

**36.** 229 N.J.Super. 56, 550 A.2d 1235 (A.D.1988).

**37.** *Id.* at 1239. The opinion in *Summit Associates* was written by Judge Cory. Neither he nor either of his *Summit Associates* panel colleagues was a member of the *Broadwell* panel. *See* note 50 *infra.*

**38.** 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

*est court of the state would decide otherwise."*

(Emphasis in original).

Next, the district court discussed the New Jersey Supreme Court's general principles of construction of insurance contracts. The district court noted that *Mazzilli v. Accident & Casualty Ins. Co.*, 35 N.J. 1, 170 A.2d 800 (1961) (a case relied on by the Appellate Division in *Broadwell*) instructs that ambiguous policy language is to be construed in favor of the insured. The district court also pointed out that the New Jersey Supreme Court insists that all portions of an insurance contract be given meaning. Then the district court quoted a recent case, *Longobardi v. Chubb Insurance Co. of New Jersey*, 121 N.J. 530, 582 A.2d 1257, 1260 (1990), in which the New Jersey Supreme Court, in reversing the Appellate Division, had observed that "the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability. Although courts should construe policies in favor of the insured, they 'should not write for the insured a better policy of insurance than the one purchased.'"

With these postulates in mind, the district court stated:

It is the conclusion of this Court that the New Jersey Supreme Court would refuse to pursue the direction indicated by its lower courts in *Jackson Township* and *Broadwell*. Instead, this writer concludes that the New Jersey Supreme Court, failing to find ambiguity susceptible of more than one interpretation, would follow the plain meaning of the phrase "sudden and accidental" and refuse to "engage in a strained construction to support the imposition of liability." Thus, the exclusion would allow

coverage only for events which are "accidental," that is, unexpected and unintended, *and* "sudden," that is, which have occurred abruptly, precipitantly, or over a short period of time. Coverage for gradual pollution would be barred under this pollution exclusion clause, as would coverage for intentional pollution.

This interpretation conforms to the teaching of *Prather* [*Prather v. American Motorists Ins. Co.*, 2 N.J. 496, 67 A.2d 135 (1949)], where the Court indicated that effect should be given to all provisions of the policy and no portion should be left "useless or inexplicable." The lower courts' determination that "sudden and accidental" means "occurrence" renders the language of the exclusion clause superfluous.

759 F.Supp. at 973.

Having stated its conclusion of law, the district court opined that the conclusion was not only in harmony "with the New Jersey Supreme Court's rules of construction for insurance contracts, but ... finds extensive support from courts across the country who have interpreted the pollution exclusion clause as this Court does today, following what appears to be the emerging nationwide trend." [39] Thereupon the district court adverted to a number of cases reaching analogous results under Michigan, New York, Maine, Massachusetts [40], Ohio, Florida, Kentucky and Kansas law.

(c) *The district court's application of the predicted New Jersey rule to the facts of record on summary judgment*

Having determined what it believed to be the applicable rule of New Jersey law, the district court applied that rule to the competing motions for summary judgment:

To receive insurance coverage, CPC has the burden of proving that the contamination of the aquifer was caused by

---

**39.** *Id.*

**40.** With respect to the Massachusetts construction of the pollution exclusion clause, the district court in the instant case referred to the Supreme Judicial Court's opinion in *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.*, 407 Mass. 675, 555 N.E.2d 568 (1990),

and to *Covenant Insurance Co. v. Friday Engineering, Inc.*, 742 F.Supp. 708 (D.Mass 1990), which applied the ruling of the Supreme Judicial Court. Subsequent to the opinion of the district court in the instant case, we have had occasion to apply that ruling in *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.*, 938 F.2d 1423 (1st Cir.1991).

events that can be characterized as "sudden and accidental," and thus fit into the exception-to-the-exception that is the pollution exclusion clause. . . .

In its "Statement of Undisputed Facts," CPC has provided no information concerning the source and causes of the contamination. CPC relies exclusively on the reports, submitted as Exhibits A and E, based on two hydrogeological studies conducted in the area. . . .

What this evidence indicates is that no one really knows exactly what events caused the contamination in the area surrounding the Peterson/Puritan plant, and, further, that CPC would be unable to establish at trial that the contamination was caused by a sudden and accidental event. In fact, what evidence there is (the conclusions of the hydrogeological engineers and the deposition testimony of Peterson/Puritan employees concerning plant practices) indicates that the contamination took place over a period of years and was caused by a combination of leaks, spills and disposal methods—in short, the kind of gradual process that

the pollution exclusion clause was designed to exclude.

*Id.* at 975–76.

Whereupon, on March 15, 1991, the district court denied CPC's motion for summary judgment and granted Northbrook's cross-motion.

### ii. *The denial of the motion to alter or amend the judgment*

On April 1, 1991, CPC filed a timely motion to alter or amend the judgment. On April 29, 1991, the district court held oral argument on the motion; following the argument, the district court delivered a bench opinion adhering to its previously stated views:

Once this kind of case is sent out of New Jersey, and is heard by a judge who looks at the big picture throughout this country, it generally leads to the same result that I came to. . . . So, my best estimate, my best prediction is that the New Jersey Supreme Court when it decides this kind of a case, with this kind of a factual situation, will look at the law throughout the country and will come to the same conclusion I came to.[41]

---

**41.** The district court's complete statement was as follows:

I listened intently to the arguments this morning and, frankly, I'm satisfied with the decision I made. I gave this case the best effort that I could give it. I came to the conclusion in my own mind that I don't think the New Jersey Supreme Court would follow those two . . . decisions, which were clearly unjustifiable. They're just bad decisions. I just don't think the New Jersey Supreme Court would adopt that rule in view of the law that's being developed throughout the United States.

I'm satisfied that the word, "sudden" means what I said it means in this decision and that's what it should mean, and that the words, "sudden and accidental," mean an accidental, unintended event which took place over a very short period of time.

One must bear in mind that what we're talking about is an exception to an exception. The basic policy of the insurance companies in this area, is not to insure against pollution damage because it's unpredictable. It could have existed over years and years and it could be enormously detrimental to an insurance company to pay such a loss when they can't determine what premiums to ask for to cover this kind of loss. But, they have an exception to the exception because they can see that it's reasonable to have coverage in a situation, for

example, where there is an explosion and there is chemical damage as a result of an explosion—a clearly definable event—or a fire in a plant with chemical loss that causes pollution. Those are the kinds of situations that can be readily identified and are an adjunct to what's being insured against in the policy, the basic policy.

So, a lot of semantics, and discussion about language, and things of that sort, really don't lead to an intelligent result in these cases. I'm satisfied that those two . . . decisions, are really an attempt to bring about a social result, protection of New Jersey insureds in the face of clear exclusionary language.

Once this kind of case is sent out of New Jersey, and is heard by a judge who looks at the big picture throughout this country, it generally leads to the same result that I came to. It seems to me that New Jersey law is based on those two . . . decisions, but it's not 15 unbroken years—other New Jersey judges have questioned those decisions. I think they're just plain wrong, and the emerging law is certainly to the contrary. So, my best estimate, my best prediction is that the New Jersey Supreme Court when it decides this kind of a case, with this kind of a factual situation, will look at the law throughout the country and will come to the same conclusion I came to. That's my best prediction, my best

## II. *Discussion*

New Jersey law governs the construction of the CPC–Northbrook CGL insurance policy. The district court's June 21, 1990 choice-of-law ruling to that effect is law of the case. The ruling is not questioned on this appeal, nor do we perceive any ready ground for questioning it. Accordingly, the paramount issue presented on this appeal is whether, in granting summary judgment in favor of Northbrook, the district court fashioned the correct rule of substantive New Jersey insurance law. Concretely, the matter to be decided is whether the district court was correct in determining that the New Jersey Supreme Court, if faced with the task of construing the pollution exclusion clause, would reject the construction arrived at by the Appellate Division in *Broadwell* and reaffirmed in *Summit Associates*.

On this appeal, CPC contends that the district court's determination of New Jersey law was erroneous. The State of New Jersey, as *amicus curiae*, joins in that contention. The issue on appeal is one of law with respect to which our review is plenary. See *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.*, 938 F.2d 1423, 1427 (3d Cir.1991). We take as our point of departure, as the district court did, the teaching of *West v. A.T. & T. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940), reaffirmed in *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967), that "[w]here an intermediate appellate court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."

The district court concluded that the New Jersey Supreme Court would not follow *Broadwell* because, "failing to find ambiguity," it "would follow the plain

estimate. Once that's been decided, then the plaintiff's case fails completely in this situation.

meaning of the phrase 'sudden and accidental'" which would "allow coverage only for events which are 'accidental,' that is, unexpected and unintended, and, 'sudden,' that is, which have occurred abruptly, precipitantly, or over a short period of time. Coverage for gradual pollution would be barred under this pollution exclusion clause." Referring to several cases arising under the law of states other than New Jersey, the district court expressed the view that the construction of the pollution exclusion clause it favored was consonant with "what appears to be the emerging nationwide trend."

In assessing the sufficiency of the district court's rationale for disregarding *Broadwell*, we derive considerable enlightenment from the Third Circuit's opinion in *New Castle County v. Hartford Accident & Indemnity Company*, 933 F.2d 1162 (3d Cir.1991). *New Castle*, which was decided on April 30, 1991, one day after the district court in the instant case denied CPC's motion to alter or amend its grant of summary judgment in Northbrook's favor, is the most encyclopedic judicial examination of the CGL policy—and, in particular, of the pollution exclusion clause—that has come to our attention. *New Castle* arose under the law of Delaware, a state whose appellate courts had not had occasion to construe the pollution exclusion clause or other CGL clauses whose meanings were in dispute. The arguments of the parties with respect to the pollution exclusion clause advanced in the Delaware District Court, and that court's response to those arguments, were described by the Third Circuit as follows:

CNA argued that the word "sudden" unambiguously has a temporal component and means "abrupt" or "brief." It contended, therefore, that the contamination from Tybouts Corner, which was due to a long-term process of discharging leachate into the groundwater, is not the type of "sudden" pollution covered by its policies. The County, on the other hand,

Plaintiff's Record Appendix Vol. V, 4002–04.

insisted that the word "sudden" is ambiguous. In view of the general precept of Delaware law that ambiguous insurance policies are construed in favor of the insureds, see *Steigler v. Insurance Company of North America,* 384 A.2d 398 at 400 (Del.Sup.1978), the County argued that the pollution exclusion clause must be interpreted to bar coverage only if the pollution damage was expected or intended.

The district court was persuaded by the County's construction of the term. After consulting numerous sources, the court concluded ... that the word "sudden," as used in the exception to the pollution exclusion clause, is susceptible of two reasonable interpretations—to wit, unexpected or brief. Resolving this ambiguity in favor of the insured, the district court held that "the term 'sudden' means a discharge, dispersal, release or escape of pollutants that is unexpected."

933 F.2d at 1192–93. The Third Circuit, on appeal, concurred in the district court's assessment of how the Delaware Supreme Court could be expected to construe "sudden and accidental."

In aid of its analysis, the Third Circuit first turned to the case law construing the pollution exclusion clause. The court noted that "[e]ach [of the parties] insists that the trend in other jurisdictions is to construe the 'sudden and accidental' exception to the pollution exclusion clause consistent with their arguments here. Although the cases assembled by the parties are legion, we discern neither a noticeable trend nor a majority position. Rather, the authority appears to be evenly divided...." *Id.* at 1195. And the court then grouped—in sequential footnotes which are reproduced here—"half of the cases holding that the clause bars coverage,[42] and ... the other half holding that it does not." [43] *Id.* at 1195. The court then noted that:

**42.** 933 F.2d at 1195 n. 60:

*See, e.g., Hayes v. Maryland Casualty Co.,* 688 F.Supp. 1513 (N.D.Fla.1988); *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.,* 168 Ill.App.3d 361, 119 Ill.Dec. 96, 522 N.E.2d 758, *appeal denied,* 122 Ill.2d 576, 125 Ill.Dec. 218, 530 N.E.2d 246 (1988); *Barmet of Indiana, Inc. v. Security Insurance Group,* 425 N.E.2d 201 (Ind.Ct.App.1981); *American Motorists Insurance Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987); *United States Fidelity & Guaranty Co. v. Morrison Grain Co.,* 734 F.Supp. 437 (D.Kan.1990); *United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988) (Kentucky law); *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990); *FL Aerospace v. Aetna Casualty & Surety Co.,* 897 F.2d 214 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990) (Michigan law); *Fireman's Fund Insurance Cos. v. Ex-Cell-O Corp.,* 702 F.Supp. 1317 (E.D.Mich.1988); *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986); *Great Lakes Container Corp. v. National Union Fire Insurance Co.,* 727 F.2d 30 (1st Cir.1984) (New Hampshire law); *Technicon Electronics Corp. v. American Home Assurance Co.,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989); *Ogden v. Travelers Indemnity Co.,* 924 F.2d 39 (2d Cir.1991); *EAD Metallurgical, Inc. v. Aetna Casualty & Surety Co.,* 701 F.Supp. 399 (W.D.N.Y.1988), *aff'd,* 905 F.2d 8 (2d Cir.1990); *New York v. Amro Realty Corp.,* 697 F.Supp. 99 (N.D.N.Y.1988); *Borden, Inc. v. Affiliated FM Insurance Co.,* 682 F.Supp. 927 (S.D.Ohio 1987), *aff'd,* 865 F.2d 1267, *cert. denied,* 493 U.S. 817, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989); *Transamerica Insurance Co. v. Sunnes,* 77 Or.App. 136, 711 P.2d 212 (1985); *review denied,* 301 Or. 76, 717 P.2d 631 (1986); *Centennial Insurance Co. v. Lumbermens Mutual Casualty Co.,* 677 F.Supp. 342 (E.D.Pa.1987); *Fischer & Porter Co. v. Liberty Mutual Insurance Co.,* 656 F.Supp. 132 (E.D.Pa.1986); *American Mutual Liability Insurance Co. v. Neville Chemical Co.,* 650 F.Supp. 929 (W.D.Pa.1987); *Lower Paxton Township v. United States Fidelity & Guaranty Co.,* 383 Pa.Super. 558, 557 A.2d 393 (1989); *Techalloy Co. v. Reliance Insurance Co.,* 338 Pa.Super. 1, 487 A.2d 820 (1984); *CPI International, Inc. v. Northbrook Excess & Surplus Insurance Co.,* 759 F.Supp. 966 (D.R.I.1991) (New Jersey law); *United States Fidelity & Guaranty Co. v. Murray Ohio Mfg. Co.,* 693 F.Supp. 617 (M.D.Tenn.1988), *aff'd,* 875 F.2d 868 (6th Cir.1989).

It is to be noted that the penultimate case cited in the foregoing list is the decision of the District Court for the District of Rhode Island which is here under review.

**43.** 933 F.2d at 1195–96 n. 61:

*See, e.g., City of Northglenn v. Chevron U.S.A., Inc.,* 634 F.Supp. 217 (D.Colo.1986); *Pepper's Steel & Alloys, Inc. v. United States Fidelity & Guaranty Co.,* 668 F.Supp. 1541 (S.D.Fla.1987); *Payne v. United States Fidelity & Guaranty Co.,* 625 F.Supp. 1189 (S.D.Fla. 1985); *Claussen v. Aetna Casualty & Surety Co.,* 259 Ga. 333, 380 S.E.2d 686 (1989); *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.,* 180 Ill.App.3d 378, 129 Ill.Dec.

the County argues that the existence of a national judicial split is evidence, in-and-of-itself, that the "sudden and accidental" language is ambiguous ... We agree with this assertion to a certain extent. Although the presence of conflicting judicial decisions does not automatically mandate a finding of ambiguity.... we think it has some relevance. We are confronted here with two contrasting lines of cases: one holding that the word "sudden" is ambiguous and thus means "unexpected," and another holding that the word "sudden" always has a temporal quality and thus means "abrupt" or "brief." While it is our responsibility to ascertain which of

these lines is most likely to be followed in Delaware, we cannot help but view such a division as at least suggesting that the term "sudden" is susceptible of more than one reasonable definition.

*Id.* at 1196.

The *New Castle* court also examined the history of the pollution exclusion clause, just as the *Broadwell* court did. The *New Castle* account of how the CGL policy moved from the pre–1966 "caused by accident" standard, through the 1966 shift to "occurrence-based" coverage, to the addition of the pollution-exclusion clause in 1970 or shortly thereafter,[44] is in substantial conformity with the *Broadwell* account.[45] One feature of the *New Castle*

306, 535 N.E.2d 1071, *appeal denied,* 127 Ill.2d 643, 136 Ill.Dec. 609, 545 N.E.2d 133 (1989); *Reliance Insurance Co. v. Martin,* 126 Ill. App.3d 94, 81 Ill.Dec. 587, 467 N.E.2d 287 (1984); *Allstate Insurance Co. v. Quinn Construction Co.,* 713 F.Supp. 35 (D.Mass.1989); *Travelers Indemnity Co. v. Dingwell,* 414 A.2d 220 (Me.1980); *Jonesville Products, Inc. v. Transamerica Insurance Group,* 156 Mich. App. 508, 402 N.W.2d 46 (1986), *appeal denied,* 428 Mich. 897 (1987); *Polkow v. Citizens Insurance Co.,* 180 Mich.App. 651, 447 N.W.2d 853 (1989); *Grinnell Mutual Reinsurance Co. v. Wasmuth,* 432 N.W.2d 495 (Minn.App. 1988); *United States v. Conservation Chemical Co.,* 653 F.Supp. 152 (W.D.Mo.1986); *Du–Wel Products, Inc. v. United States Fire Insurance Co.,* 236 N.J.Super. 349, 565 A.2d 1113 (1989); *cert. denied,* 121 N.J. 617, 583 A.2d 316 (1990); *Summit Associates, Inc. v. Liberty Mutual Fire Insurance Co.,* 229 N.J.Super. 56, 550 A.2d 1235 (1988); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 528 A.2d 76 (1987); *Jackson Township v. Hartford Accident & Indemnity Co.,* 186 N.J.Super. 156, 451 A.2d 990 (1982); *Avondale Industries, Inc. v. Travelers Indemnity Co.,* 887 F.2d 1200 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *National Grange Mutual Insurance Co. v. Continental Casualty Insurance Co.,* 650 F.Supp. 1404 (S.D.N.Y.1986); *Colonie Motors, Inc. v. Hartford Accident & Indemnity Co.,* 145 A.D.2d 180, 538 N.Y.S.2d 630 (1989); *Allstate Insurance Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603 (1980); *Kipin Industries v. American Universal Insurance Co.,* 41 Ohio App.3d 228, 535 N.E.2d 334 (1987); *Buckeye Union Insurance Co. v. Liberty Solvents & Chemicals Co.,* 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984); *Benedictine Sisters of St. Mary's Hospital v. St. Paul Fire & Marine Insurance Co.,* 815 F.2d 1209 (8th Cir.1987); *United Pacific Insurance Co. v. Van's Westlake Union, Inc.,* 34 Wash.App. 708, 664 P.2d 1262, *review de-*

*nied,* 100 Wash.2d 1018 (1983); *Just v. Land Reclamation, Ltd.,* 155 Wis.2d 737, 456 N.W.2d 570 (1990); *Compass Insurance Co. v. Cravens, Dargan & Co.,* 748 P.2d 724 (Wyo. 1988).

**44.** As pointed out in note 8, *supra,* the *Broadwell* court stated that the pollution exclusion clause appeared in 1973, whereas the *New Castle* court traced the genesis of the clause to 1970. Nothing appears to turn on this chronological discrepancy, if discrepancy there be. Actually, it seems a reasonable surmise that there is no real discrepancy. The history provided in *New Castle* (see note 44, *infra*) appears to establish that insurance industry representatives were presenting and explaining the proposed clause to state regulatory officials as early as 1970; but it may have taken a few years for the clause to be accepted and introduced into policies nationwide.

**45.** The *New Castle* court's account of the history of the pollution exclusion follows (933 F.2d at 1196–98 (footnotes omitted)):

The district court record reveals that, prior to 1966, the standard CGL policy covered bodily injury and property damage "caused by accident." Although these early policies did not define the word "accident," insurers, hoping to limit coverage to brief catastrophic events, argued that the term did not embrace gradual damage. This argument, however, was roundly rejected by the judiciary, which instead held that "accident" policies covered unintended injury or damage resulting from, among other things, extended exposure to pollutants. *See, e.g., Moffat v. Metropolitan Casualty Insurance Co.,* 238 F.Supp. 165, 172–73 (M.D.Pa.1964).

In acknowledgment of the prevailing case law, the insurance industry in 1966 increased premiums and switched to "occurrence-based" coverage. The standard policy defined an oc-

account not found in the *Broadwell* account is a reference to the long-established use of the phrase "sudden and accidental" in boiler and machinery insurance policies:

The phrase "sudden and accidental" was not new to the insurance industry.

currence as " 'an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.' " Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 Geo.L.J. 1237, 1246–47 (1986). The standard, occurrence-based policy thus covered property damage resulting from gradual pollution. So long as the ultimate loss was neither expected nor intended, courts generally extended coverage to all pollution-related damage, even if it arose from the intentional discharge of pollutants. *Id.* at 1250.

The parties' respective accounts of the history begin to diverge at around 1970. At that time, amid growing public awareness of the deleterious environmental effects of pollution, insurers again changed their insurance policies. In particular, they tacked the pollution exclusion clause onto their occurrence-based policies, thereby disclaiming coverage for damage arising out of the discharge of pollutants. As we have emphasized throughout this opinion, however, this exclusion does not apply if such discharge is "sudden and accidental."

According to the County, the insurers appended this exclusion onto their policies in order to reaffirm existing limits on pollution coverage, thus distancing themselves in the public mind from deliberate polluters. Because coverage for intentional pollution already was excluded by the "occurrence" language, the County claims, the addition of the pollution exclusion clause was intended merely to clarify (or reinforce) preexisting limits on coverage. CNA, of course, advances a different version of events. It asserts that the pollution exclusion clause was added in order to reintroduce the temporal requirement of suddenness, which had been deleted when insurers shifted from an accident-based policy to one that was occurrence-based. Additionally, as is discussed at length *infra* in Part IV.D.2., CNA contends that the pollution exclusion clause was intended to recast CGL policies' focus from the loss to the discharge: that is, pollution damage henceforth was covered only if the discharge of pollutants, not the resulting loss, was "sudden and accidental."

The phrase "sudden and accidental" was not new to the insurance industry. For many years, it had been used in the standard boiler and machinery policy, and the courts uniformly had construed the phrase to mean unexpected and unintended. *See, e.g.,*

For many years, it had been used in the standard boiler and machinery policy, and the courts uniformly had construed the phrase to mean unexpected and unintended.... We think that it is reasonable to assume that the insurance indus-

*Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Casualty Co.,* 53 Wash.2d 404, 333 P.2d 938 (1959); *New England Gas & Electric Ass'n v. Ocean Accident & Guarantee Corp.,* 330 Mass. 640, 116 N.E.2d 671 (1953); *see also* 10 A.G. Couch, *Couch on Insurance 2d* § 42:396, at 505 (M. Rhodes rev. 2d ed. 1982) ("When coverage is limited to a sudden 'breaking' of machinery the word 'sudden' should be given its primary meaning as a happening without previous notice, or as something coming or occurring unexpectedly, as unforeseen or unprepared for. That is, 'sudden' is not to be construed as synonymous with instantaneous." (footnote omitted)). We think that it is reasonable to assume that the insurance industry was aware of this construction when it chose to use the phrase "sudden and accidental" in the pollution exclusion clause. *See* 2 G. Couch, *Couch on Insurance 2d* § 15:20, at 195–96 (M. Rhodes rev. 2d ed. 1984) ("The judicial construction placed upon particular words or phrases made prior to the issuance of a policy employing them will be presumed to have been the construction intended to be adopted by the parties.").

This history is reinforced by the representations made by insurance industry officials to state authorities in an effort to gain regulatory approval of the pollution exclusion clause. Insurance company executives stated that the language of the clause was a mere clarification of the "occurrence" definition, excluding coverage only for expected or intended pollution. The standard explanatory memorandum submitted by the IRB to state insurance commissioners noted that:

Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused by injuries where the pollution or contamination results from an accident....

*See, e.g.,* app. at 3173 (Memorandum to George F. Reed, Pennsylvania Commissioner of Insurance, dated May 8, 1970). That insurers publicly marketed the exclusion as a clarification, rather than a restriction of coverage, further indicates that "sudden and accidental" may mean, as the County suggests, unexpected and unintended. At the very least, we think that such comments on the part of the insurers corroborate the County's claim that the phrase is ambiguous.

try was aware of the construction when it chose to use the phrase "sudden and accidental" in the pollution exclusion clause.

933 F.2d at 1197.

The Third Circuit's conclusions with respect to the proper construction of the pollution exclusion clause were as follows:

> When first confronted with this issue, the reader's initial reaction is likely to be that "sudden" means "abrupt." Upon considering the foregoing factors, however, we now are convinced that the County's alternative interpretation of "sudden" (as meaning "unexpected") "reflect[s] a reasonable reading of the contractual language." [*Aetna Casualty and Surety Co. v.] Kenner*, 570 A.2d [1172] at 1174 [ (Del.Sup.1990) ]. Our dictionaries, like the district court's, define "sudden" both with and without a temporal element, thus lending considerable weight to the County's assertion that either interpretation is reasonable. We also are impressed by the profound judicial disagreement over the meaning of the phrase "sudden and accidental." That so many learned jurists throughout the nation differ on the construction of this phrase is, in our view, additional proof that the phrase admits of two reasonable constructions. Lastly, we think that the history of the pollution exclusion clause quells all remaining doubts that the phrase "sudden and accidental," in the context of post–1970 CGL policies, can reasonably be construed to mean "unexpected and unintended." Not only is that the meaning that was ascribed to the phrase when it first appeared in boiler and machinery policies, but it also is consistent with the insurance industry's contemporaneous representations to state insurance commissioners.
>
> Because the term "sudden" appears capable of two reasonable interpretations ("abrupt" and "unexpected"), we conclude that the term is ambiguous under Delaware law. The dictates of that state's insurance law therefore require us to resolve this ambiguity in favor of the County by construing "sudden" to mean "unexpected."

933 F.2d at 1198–99.[46]

The principal question addressed in the Third Circuit's discussion of the pollution exclusion clause in *New Castle*—whether, under Delaware law, the clause is ambiguous and hence to be construed in favor of the insured—is exactly the question, under New Jersey law, that was addressed by the Appellate Division in *Broadwell*. We are satisfied that the mode of analysis employed, and the conclusion arrived at, in *New Castle* confirm the reasonableness of the approach taken by the Appellate Division in *Broadwell*. But *New Castle* does more than demonstrate the reasonableness of *Broadwell*. It establishes that a federal court that has studied the provenance and judicial construction of the pollution exclusion clause more closely than any other court, and that has had no guidance from the intermediate appellate court of the relevant state aside from adherence to the pervasive principle that ambiguous insurance policy language is to be construed favorably to the insured, has found itself driven to the conclusion that the pollution exclusion clause is ambiguous. And this signifies to us that, when a federal court is advised that the intermediate appellate court of the relevant state has found the pollution exclusion clause to be ambiguous and that there are no reported cases in that state to the contrary, the federal court has no warrant to reject the teaching of the intermediate appellate court.

■ In short, we are of the view that the legal materials discussed by the district court in its March 15, 1991 opinion granting Northbrook's summary judgment motion

---

**46.** Shortly after *New Castle* the Third Circuit, in *Northern Ins. Co. v. Aardvark Associates, Inc.*, 942 F.2d 189 (3d Cir.1991), held that under Pennsylvania law "sudden," as used in the pollution exclusion clause, has a temporal component; in so holding the Third Circuit followed a ruling of the Pennsylvania Superior Court, Pennsylvania's intermediate appellate court of general jurisdiction.

did not contain "persuasive data," *West v. A.T. & T. Co., supra,* 311 U.S. at 237, 61 S.Ct. at 183, warranting disregard of the construction of the CGL pollution exclusion clause arrived at by the Appellate Division in *Broadwell.*[47] This would end our inquiry, but for the fact that there are additional legal materials—namely, a 1989 case and two 1990 cases—which appear to us to be pertinent and which were not discussed by the district court in its March 15, 1991 opinion.[48] We think it appropriate to consider whether those cases, viewed in the light of the legal materials already canvassed, offer a substantial basis for upholding the district court's rejection of the legal principles adopted by the Appellate Division.

The first of the three cases was *Diamond Shamrock Chemicals Co. v. The Aetna Casualty and Surety Co.,* No. C–3939–84 (Morris Co., Ch. Div., April 12, 1989). In *Diamond Shamrock,* Judge Stanton, of the Morris County Superior Court, expressed disagreement with *Broadwell* and the Superior Court cases leading up to it. In Judge Stanton's view, his colleagues' opinions "have ... flatly misread the plain language of the pollution exclusion and have fundamentally misunderstood the way in which the exclusion and its exception are designed to function." *Diamond Shamrock,* slip op. at 22. "[S]udden," according to Judge Stanton, should have been read to mean "instantaneous (or almost instantaneous)." *Id.* at 23.[49] For the double reason that *Diamond Shamrock* (1) is unreported, and (2) is an opinion of a court subordinate to the Appellate Division in New Jersey's judicial hierarchy and on which, therefore, *Broadwell* and *Summit Associates* are binding authority to the contrary, we could, arguably, disregard *Diamond Shamrock.* However, notwithstanding that Judge Stanton's opinion, because it is unreported, carries no formal precedential weight in New Jersey's

**47.** Another ground offered by the district court for rejecting *Broadwell*—namely, that the Appellate Division had in effect conflated the definitions of "occurrence" and "sudden and accidental" and thereby rendered "the language of the exclusion clause superfluous"—seems to us unpersuasive. Absent the "sudden and accidental" exception to the pollution exclusion clause, an "occurrence"—i.e., "an accident, event or happening ... neither expected nor intended from the standpoint of the insured"—which arose "out of the discharge ... of ... pollutants" would not be covered by the policy.

We note that the Fourth Circuit, in a diversity case calling for the application of New Jersey law, has recently concluded that the New Jersey Supreme Court would not follow *Broadwell.* See *Liberty Mutual Insurance Co. v. Triangle Industries,* 957 F.2d 1153 (4th Cir.1992). We have considered the reasons adduced by that court and, with respect, we are constrained to disagree.

**48.** We intimate no criticism of the district court for not discussing the three cases. The first of the three was an unreported state trial court opinion cited by Northbrook, and it is entirely possible that the district court felt it inappropriate to discuss an opinion which, because it was unreported, apparently lacks formal precedential weight in the New Jersey court system. See note 50, *infra.* The other two cases were cited by CPC in its motion to alter or amend the judgment, V Plaintiff's Record Appendix 3517–56, but it may be that they were not squarely presented to the district court at an earlier phase.

**49.** While critical of *Broadwell,* Judge Stanton did not contest its binding authority. He concluded, however, that *Broadwell* was not dispositive of the case before him, because the record established that "Diamond was a highly knowledgeable purchaser of insurance with a substantial amount of bargaining power in the insurance markets" and that Diamond's insurance manager and insurance broker "were clearly of the view that the pollution exclusion barred recovery for claims arising out of gradual pollution...." *Diamond Shamrock,* slip op. at 24. We would not, of course, presume to assess the facts of record in *Diamond Shamrock,* most especially as they bear upon the insured's particularized understanding of the pollution clause's applicability to gradual pollution. But we would suggest that Judge Stanton's reliance on the New Jersey Supreme Court's opinion in *Werner Industries, Inc. v. First State Ins. Co.,* 112 N.J. 30, 548 A.2d 188 (1988) was inapposite. *Werner* did indeed stress the sophistication of the insured in the case before the court, but the case was one in which, so the New Jersey Supreme Court found, the policy language was "unambiguous." Moreover, in *Werner* (a case cited by the district court in the instant case and relied on by respondent in its brief on appeal), the New Jersey Supreme Court remanded the case to the trial court for inquiry into whether the insured, notwithstanding its sophistication, had justifiably relied on its claimed understanding of the *unambiguous* policy language.

corpus juris,[50] the opinion does seem to us a datum to be taken into account in determining whether there are "persuasive data" that the New Jersey Supreme Court would not follow the path charted by the Appellate Division in *Broadwell* and followed in *Summit Associates.*[51]

On the other side of the ledger are two opinions by New Jersey federal judges.

In *National Starch and Chemical Corp. v. Great American Insurance Companies,* 743 F.Supp. 318 (D.N.J.1990), Judge Ackerman was called on to decide whether New York or New Jersey law controlled the interpretation of the pollution exclusion clause in the case before him. Judge Ackerman noted that "New Jersey law is significantly more favorable to the insured than New York law." *Id.* at 319 n. 1. Citing *Broadwell* and *Jackson Township,* Judge Ackerman stated that "New Jersey courts liberally interpret pollution exclusion clauses in favor of the insured, as well as exclusions for damages on the property of the insured." *Id.* Judge Ackerman con-

cluded that New Jersey law applied to the case before him.

In *Marotta v. RLI Insurance Co.,* Civ. No. 87–4430 (D.N.J. June 5, 1990),[52] Judge Bissell found that *Broadwell's* construction of the pollution exclusion clause was controlling. In reaching his decision, Judge Bissell took note of Judge Stanton's opinion in *Diamond Shamrock* but went on to observe:

> This Court predicts that the New Jersey Supreme Court would adopt the sound reasoning advanced by Judge Baine, on behalf of Judges Pressler and Caulkin as well, in *Broadwell Realty* and construe the term "sudden" to mean unexpected and unintended.

*Marotta,* slip op. at 28.

We agree with Judge Bissell. Other than *Diamond Shamrock*—which Judge Bissell found unconvincing—there are no "persuasive data" that the New Jersey Supreme Court would disrespect the analysis developed by the Superior Court, elaborated by the Appellate Division, and adhered to by Judges Ackerman and Bissell.[53]

---

**50.** See Rule 1:36–3 of New Jersey Rules of General Application (1981). *Diamond Shamrock* was mentioned by counsel for Northbrook in the course of oral argument before the district court on CPC's motion to alter or amend the judgment. V Plaintiff's Record Appendix 3990. And apparently it had been cited in Northbrook's summary judgment submission. *Id.* Very possibly the district court refrained from discussing *Diamond Shamrock* because it was an unreported case. But the district court may have had *Diamond Shamrock* in mind when, in the bench opinion denying the motion to alter or amend the judgment, the district court observed that "other New Jersey judges have questioned" the *Broadwell* jurisprudence. See note 40, *supra.* Our research has not uncovered New Jersey cases other than *Diamond Shamrock* that have taken issue with the *Broadwell* line of cases.

**51.** Conceivably, a comparable datum might be a public—but unpublished—talk by a Rutgers or Seton Hall law professor taking the Appellate Division to task.

An unreported opinion cutting against *Diamond Shamrock* is that of the Appellate Division in *Township of Jackson v. American Home Insurance Company,* A–170–8173, A–502–8173, A–503–8173, and A–1294–8173 (March 24, 1982). There, in a case that was a companion to the *Jackson Township* case discussed in the text, *supra,* at notes 14 to 16, the Appellate Division sustained an interlocutory ruling by Judge Ha-

vey that the pollution exclusion clause did not insulate the defendant insurers from an obligation to assume the defense of claims made against the Township of Jackson. However, the Appellate Division's disposition of the issue was summary (see pages 79–80 and 81) and thus adds nothing to the analysis later deployed in *Broadwell* and reaffirmed in *Summit Associates.* For present purposes, the one notable aspect of *Township of Jackson* is that the panel consisted of three appellate judges different from the three *Broadwell* judges and the three *Summit Associates* judges.

**52.** *Marotta,* like *Diamond Shamrock,* is not a reported opinion. However, there appears to be no rule of practice that makes the persuasive authority of a federal district court opinion contingent on its appearance in Federal Supplement.

**53.** In attaching substantial weight to the opinions of Judges Ackerman and Bissell, we think it not amiss to point out that both judges were members of the New Jersey judiciary before being appointed to the federal bench.

This is not intended to suggest that a court of appeals weighing an appeal from a district judge's determination of state law in the state in which the judge sits owes special deference to that judge's determination; to the contrary, the correctness of such a determination is a ques-

It follows that we disagree with the district court's "conclusion ... that the New Jersey Supreme Court would refuse to pursue the direction indicated by its lower courts in *Jackson Township* and *Broadwell.*"[54]

### Conclusion

For the foregoing reasons, we conclude that the grant of summary judgment in favor of Northbrook was in error. Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

Concurrence follows.

LEVIN H. CAMPBELL, Circuit Judge (Concurring).

I find Judge Pollak's careful analysis unanswerable on the only question that really matters—what is the current law of New Jersey? Since we must follow New Jersey law, I agree with the court's opinion. Northbrook's argument that the Supreme Court of New Jersey would not follow the decisions of that state's intermediate appellate court is seriously undercut by Northbrook's actions in this very case. Because it was Northbrook which removed the case from the New Jersey Superior Court to the District Court for the District of New Jersey, Northbrook is hard-pressed to argue that the case would have been decided in its favor in the state court system. *See, e.g., Kassel v. Gannett Co., Inc.,* 875 F.2d 935, 950 (1st Cir.1989) (party who

"reject[s] state-court forum in favor of a federal forum ... is in a perilously poor position to grumble when we follow existing state precedent"); *Porter v. Nutter,* 913 F.2d 37, 41 (1st Cir.1990).

This case clearly demonstrates how unfortunate it is that New Jersey lacks a certification law or rule. It should be, but alas is not, possible for us to certify this important question to the state's highest court. If we could do so, all guesswork would be eliminated. As the United States Supreme Court has noted, certification "save[s] time, energy, and resources and helps build a cooperative judicial federalism." *Lehman Brothers v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974).

I am particularly distressed about the lack of a certification procedure in New Jersey because I agree with Judge Lagueux that the most appropriate construction of the policy language is the one the district court adopted. But too many courts have gone the other way for us to apply our own reading, no matter how enlightened we may think it is, given the strong indication by New Jersey's lower courts that New Jersey law is different.

### MEMORANDUM ON DENIAL OF REHEARING

On April 15, 1992, an Order was entered on behalf of this panel denying Northbrook's petition for rehearing. In the

---

tion of law with respect to which the court of appeals exercises *de novo* review. *Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). The point here is a different one. The point here is that the cited opinions of Judges Ackerman and Bissell are, in effect, incremental factual data as to New Jersey law which are properly to be considered, just as the opinions of New Jersey state courts are properly to be considered, in making an assessment whether the state's highest court will or will not follow the pronouncements of the state's intermediate appellate court. In that context, the fact that a federal judge has had experience on the state bench may reasonably be thought to enhance the weight to be accorded that federal judge's view of state law.

**54.** Since it was Judge Bissell whose § 1404(a) order transferred the instant case from the District of New Jersey to the District of Rhode

Island, it would appear that, had the case not been transferred, *Broadwell* would have been found by Judge Bissell to state the applicable rule of law in the instant case. Had we concluded that Judge Bissell's allegiance to *Broadwell* was a misstatement of New Jersey law, we would have had to confront the intriguing question whether a § 1404(a) transferee court— which, pursuant to *Van Dusen v. Barrack, supra,* note 1, must apply the same principles of state law that would have been applied by the transferor court—is under a duty to follow a state law rule formulated by the transferor court that the transferee court reasonably believes is an erroneous statement of the transferor jurisdiction's law. Since we concur in Judge Bissell's assessment of New Jersey law, that intriguing question is not presented in this case.

present memorandum, filed subsequent to said Order, the panel sets forth the reasons behind its denial.

Northbrook's April 7, 1992 petition for rehearing presents five contentions:

1. Northbrook's first contention is that the panel opinion ignored "the unrebutted factual record which supports the decision of the district court;" more particularly, it is argued that "Northbrook provided a record which showed in exquisite detail that CPC clearly understood the Northbrook policy to exclude coverage for gradual discharges of pollutants occurring as a regular part of CPC's business." The contention was not addressed by the district court in its opinion granting summary judgment. It is presumably open to Northbrook to present the contention to the district court on remand. *Compare Diamond Shamrock Chemicals v. The Aetna Casualty & Surety*, A–694–89T1, slip op. at 45–48, 1992 WL 150686 (N.J.Super.Ct.App.Div. April 6, 1992).

2. and 4. The second and fourth contentions—that the panel erred in "rejecting persuasive data on how the New Jersey Supreme Court would apply the pollution exclusion," and that the panel should have been guided by the Fourth Circuit's reading of New Jersey law in *Liberty Mutual Insurance Co. v. Triangle Indus.*, 957 F.2d 1153 (4th Cir.1992)—undertake to reargue matters addressed in the panel opinion. *See also Gilbert Spruance Co. v. Pennsylvania Manufacturers' Association Insurance Company*, 254 N.J.Super. 43, 46, 603 A.2d 61, 62 (N.J.Super.Ct.App.Div. Feb. 14, 1992); *Diamond Shamrock*, slip op. at 35–45.

3. The third contention—that "[e]ven under *Broadwell*, [*Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.*, 218 N.J.Super.Ct. 516, 528 A.2d 76 (1987)], the record establishes that Northbrook was entitled to summary judgment in its favor," was not addressed in the district court's opinion and was not argued in Northbrook's brief in this court.

5. The fifth contention is that "a decision after oral argument in this case indicates that New Jersey itself might defer to the law of another state in deciding how the pollution exclusion is to be applied;" specifically, it is argued that, pursuant to the choice-of-law discussion in the Appellate Division's opinion in *Gilbert Spruance, supra*, 254 N.J.Super. at 51, 603 A.2d at 65, "a New Jersey court would look to Rhode Island law to interpret the pollution exclusion and cases such as *Broadwell* or, by extension, *New Castle County [New Castle County v. Hartford Accident & Indemnity Company*, 933 F.2d 1162 (3d Cir.1991)] would not be controlling in any event." An April 9, 1992 letter from counsel to Northbrook supplements the petition for rehearing, citing the choice-of-law discussion in the Appellate Division's opinion in *Diamond Shamrock, supra*, slip op. pp. 31–33, to the same effect.

It is certainly arguable that *Gilbert Spruance* and *Diamond Shamrock* carry as far as Northbrook contends they do. *But cf., Armotek Industries v. Employers Insurance of Wausau*, 952 F.2d 756, 759 n. 4 (3d Cir.1991). However, the argument is one that Northbrook cannot press on petition for reargument since Northbrook did not properly preserve the issue in its brief on appeal. It will be recalled that the district court, prior to the ruling on summary judgment, had made a choice-of-law ruling that a New Jersey court would apply the substantive law of New Jersey. Northbrook sought, unsuccessfully, to have the choice-of-law question certified to this court. The subsequent district court proceedings culminated in the district court's grant of summary judgment in Northbrook's favor, based on the district court's reading of New Jersey substantive law. CPC appealed. Appellee Northbrook in its brief on appeal alluded to the choice-of-law question in responding to an argument made in the brief of appellant CPC. But Northbrook did not affirmatively contend that this court, if not prepared to affirm the district court's grant of summary judgment, should determine that the district court's choice-of-law ruling had been erroneous and should not govern further proceedings in the district court. With mat-

ters in that posture, the panel opinion characterized the district court's choice-of-law ruling as "law of the case." Whether, on remand, it would be (a) within the district court's authority, and/or (b) an appropriate exercise of the district court's discretion, to reexamine the choice-of-law question are matters about which we think it would not be appropriate for us to engage in advisory opining.

Accordingly, the petition for panel rehearing has been denied.