### TEXTRON, INC.

v.

### AETNA CASUALTY AND SURETY COMPANY et al.

No. 92–650–Appeal.

Supreme Court of Rhode Island.

March 11, 1994.

John F. Bomster (argued), John A. Tarantino, W. James McKay, Victoria M. Almeida, W. Mark Russo, Sherry A. Guarrusso, Adler Pollock & Sheehan Incorporated, Providence, for plaintiff.

Mark C. Hadden, Gidley, Sarli & Marusak, Providence, Allan B. Taylor (argued), Day, Berry & Howard, Hartford, CT, for defendant.

## OPINION

MURRAY, Justice.

This case comes before this court on the appeal of the plaintiff, Textron, Inc. (Textron), from a Superior Court's granting of partial summary judgment in favor of the defendant, Aetna Casualty and Surety Company (Aetna), pursuant to Rule 56(c) of the Superior Court Rules of Civil Procedure.

The gravamen of this appeal is whether Textron possesses insurance coverage under certain comprehensive general-liability insurance policies issued to it by Aetna for claims asserted against it in connection with the cleanup of environmental contamination at a location acquired by Textron. The parties do not dispute that Textron had valid insurance policies in effect at the time of the contaminations; however, the dispute centers on whether the insurance policies' definition of the term "named insured" invoked the insurance policies' coverage. Textron seeks the enforcement of a defense and indemnification clause in the insurance agreements.

The facts underlying this insurance-contract-interpretation dispute are as follows. Aetna has provided insurance for Textron for a number of years; however, for purposes of this appeal, only the policies issued from 1969 through 1979 are at issue. Each policy defined its "policy period" as commencing at 12:01 a.m. on January 1 of the year in which the policy became effective until 12:01 a.m. of the ensuing January 1.

In November 1980 Textron signed an agreement to acquire Basic Microelectronics, Inc. (BMI), located in Lake Park, Florida. The formal acquisition was completed on January 9, 1981. For the purposes of the insurance agreements under review, Textron acquired the location subsequent to the alleged occurrence of certain activities that led to environmental infractions. Textron owned and operated the BMI facility from January 1981 to December 1985. In November 1983 the Florida Department of Environmental Regulation (FDER) issued a violation notice to BMI indicating that certain operations at the BMI site had allegedly contaminated the surrounding ground water.

As a result of the environmental contaminations, Textron entered into three consent agreements, two with the FDER and one with the United States Government pursuant to the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. § 9601 through § 9675

(CERCLA), to clean up the BMI site. It is the function of CERCLA to impose joint and several liability upon an owner of property or a potentially responsible party for environmental property damage. *Id.* at § 9607. As of June 1988 Textron had incurred some $500,000 in cleanup costs with regard to the BMI site, and Textron alleges that these costs could escalate to more than $2 million.

In granting defendant's motion for summary judgment, the motion justice found that the Aetna policies covered Textron and other companies owned or operated by Textron during the 1969 through 1979 policy periods. Relying on the fact that Textron did not own or operate BMI during that period, the motion justice granted summary judgment in favor of Aetna.

Textron contends that the motion justice erred as a matter of law by holding that it was not covered by the Aetna policies for the property damage that took place at the BMI site during the years 1969 through 1979. Textron avers that a strict reading of the explicit language of the insurance policies demonstrates that coverage exists. Textron also contends that even if the policies were deemed to be ambiguous, it must still prevail because precedent dictates that ambiguities in insurance contracts are to be construed in the manner most favorable to the policyholder.

Aetna contends that the motion justice correctly construed the insurance policies in order to effectuate their purpose and the parties' intent. Aetna asserts that since Textron neither caused the damage nor owned the property during the policies' periods, the policies do not cover the claims for which Textron seeks indemnification and defense.

When considering an appeal of a grant of summary judgment, this court employs the same standard and rules that the trial justice applied in evaluating the motion. *Holliston Mills, Inc. v. Citizens Trust Co.*, 604 A.2d 331, 334 (R.I.1992). We examine the pleadings and affidavits in the light most favorable to the nonmoving party to decide whether an issue of material fact existed and whether the moving party was entitled to summary judgment as a matter of law. *Id.* at 334–35. "Summary judgment is proper when there is

no ambiguity as a matter of law." *Id.* at 334. A party opposing a motion for summary judgment must assert facts that "raise a genuine issue to be resolved." *Id.* at 335.

The limited issue before this court is whether a comprehensive general-liability insurance policy covers property damage arising as a result of conduct of a third party at a time when the insured had no nexus to the property or the third party. We must turn to the language of the insurance agreements in search of our answer. The determination of coverage must be based solely upon the language contained in the Aetna policies.

■■■ It is a well-settled rule that this court is bound to follow the rules for the construction of contracts when interpreting the terms of an insurance policy. *Malo v. Aetna Casualty and Surety Co.*, 459 A.2d 954, 956 (R.I.1983). The language contained in a policy must be given its plain and ordinary meaning. *Id.* "When the terms are found to be clear and unambiguous, the task of judicial construction is at an end. The contract terms must then be applied as written and the parties are bound by them." *Id.* Before this court can construe the terms of an insurance policy, we must first find that an ambiguity exists. *Amica Mutual Insurance Co. v. Streicker*, 583 A.2d 550, 551–52 (R.I.1990). In our analysis to determine whether an ambiguity exists, we view the insurance policy as a whole and in its entirety. *Id.* at 552. When this court finds that an ambiguity exists or that the terms of an insurance contract are subject to more than one reasonable interpretation, the insurance contract will be strictly construed against the insurer. *Id.* "A court should not, however, stretch its imagination in order to read ambiguity into a policy where none is present." *Mullins v. Federal Dairy Co.*, 568 A.2d 759, 762 (R.I.1990).

■■■ Given these principles of insurance-contract construction, we now examine the policies' provisions. The policies begin by stating that

"[t]he company [Aetna] will pay on behalf of the insured all sums which the insured shall become legally obliged to pay as damages because of

bodily injury or

property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage * * *."

The parties do not argue over the interpretation of this defense and indemnification section of the insurance agreement. The main dispute revolves around the language of the named-insured section of the policies. The named-insured segment of the policies states that

" '[n]amed insured' means the persons or organizations designated in [the declarations page] and also any subsidiary company (including subsidiaries thereof) or entity o[f] such *named insured* now existing or which such *named insured* may acquire, organize or control *during the policy period* * * *." (Emphasis added.)

Textron contends that although the named-insured section of the policies does limit coverage for liability claims asserted against after-acquired subsidiaries because of the "during the policy period" language, that language does not apply to Textron itself. Textron argues that this "temporal limitation" does not operate to "engraft upon the policy a freeze-frame definition of Textron." Textron avers that the fundamental flaw in Aetna's argument is that it ignores the fact that the liability for which coverage is sought is against Textron itself, on the basis of the strict liability imposed under CERCLA. Textron asserts that as an owner of the property it has the legal obligation to absorb the cleanup costs and thus incur liability under the policies, not a subsidiary or other entity falling within the limiting language of the policies. Textron concludes coverage should exist because it has incurred a liability from property damage during a policy period. In summary Textron accuses Aetna of treating its own policies' language as "an unwanted orphan" at its doorstep.

Aetna contends that the insurance policies limit liability coverage to property owned or acquired during the policies' periods. It contends that during the effective dates of all the policies under review, BMI was a "total stranger" to the policies. Consequently, Aetna concludes, since Textron did not own or control BMI from 1969 through 1979, BMI was not an "insured" under the insurance policies in effect.

Because this court has never specifically addressed this narrow issue, we look for guidance to other jurisdictions that have analyzed similar situations. Although we have discovered many reported decisions and secondary authorities on the ramifications of CERCLA, we note that the limited issue now before us has not been widely addressed in reported decisions.

Although our analysis is limited to the reasonable interpretation of the insurance-contract language, we are persuaded by the reasoning of *Upjohn Co. v. Aetna Casualty and Surety Co.*, 1991 WL 490026 (W.D.Mich.). The facts of *Upjohn* are similar to the facts now before this court. While specifically acknowledging CERCLA and the premise that Upjohn could be held jointly and severally liable for the cost of cleaning up various sites, irrespective of its involvement with the sites or the parties involved, the court rejected Upjohn's claim for coverage under the policies issued to it prior to its involvement with the sites. *Id.* at 3, 5. The *Upjohn* court found that the language of the insurance policies that it reviewed was not ambiguous and further held that

"[a]t the time of the contamination that occurred during the years that Upjohn was insured by [the company], Upjohn had no legal or factual relationship, connection or involvement with the damaged property. * * * *[The insurance company] is not obligated to indemnify or provide defense to Upjohn for potential liability which has arisen from the contamination of property with which Upjohn had no connection or involvement during the years that the [insurance] policies were in effect. "* (Emphasis added.) *Id.* at 5.

The *Upjohn* court reasoned that although the harm arose during the period that the insurance policies were in effect, there was no basis for Upjohn's liability because, at that time, it had "no legal or factual * * *

connection" with the damaged property. *Id.* "The basis for Upjohn's liability under the law is its connection to or involvement with the contaminated property—that connection did not arise until after [the policies under review] had expired." *Id.* Other courts analyzing similar factors have echoed *Upjohn's* reasoning. *See, e.g., Dant & Russell, Inc. v. United Pacific Insurance Co.,* C.V. No. 89–915–PA (D.Or. May 15, 1990) ("merely because pollution occurred during the years that [the insurance policies] were in effect is insufficient to trigger [Aetna's] duty to defend").

The *Upjohn* court also discussed some convincing public-policy arguments supporting its decision, but we need not engage in this type of academic exercise, no matter how seductive, as we are bound by the language in the insurance agreements. For an additional thought-provoking analysis of the public-policy ramifications of CERCLA on insurance agreements, see *Boeing Co. v. Aetna Casualty and Surety Co.,* 113 Wash.2d 869, 905–12, 784 P.2d 507, 525–29 (1990) (Callow, C.J., dissenting).

Textron's interpretation of the policies is, at best, questionable. Instead of viewing the insurance policies as a whole in order to effectuate their purpose, Textron seeks to concentrate on isolated phrases in abstraction from the text of the entire document.

"Because ambiguity lurks in every word, sentence, and paragraph in the eyes of a skilled advocate * * * the question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only *one reasonable meaning* when construed, *not in a hypertechnical fashion, but in an ordinary, common sense manner.*" (Emphasis added.) *New Castle County v. Hartford Accident and Indemnity Co.,* 970 F.2d 1267, 1270 (3d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993).

Viewing the policies in their entirety and using the plain, ordinary, and usual meaning of the words, we view the temporal limitation "during the policy period" as applying to the entire named-insured section of the policies. Accordingly, that includes both Textron and its after-acquired subsidiaries. It is not our function " 'to seek out ambiguity when there is none * * *.' " *Streicker,* 583 A.2d at 552. We do not interpret these policies as ambiguous.

We do not find any support for Textron's interpretation of the contract. In fact we believe that the named-insured section's limiting language is lucid. The named-insured verbiage, specifically referring to the named insured on the declarations page, (that is, Textron), is listed three times in one sentence. It is reasonable to interpret this section as restricting the scope of Aetna's coverage to the actions of both Textron and those entities owned or acquired by Textron during the policy period. The rules of contract construction and the "rules of common sense," if such rules actually exist, dictate this result. *See generally id.* at 554.

We believe that the entire policy supports this contention. The definitions section of the policies define "property damage" as "physical injury to or destruction of tangible property which occurs *during the policy period* * * *."* (Emphasis added.) *See generally Upjohn,* at 3. It is uncontradicted that while the policies in question were in effect, Textron had no relationship with or connection to BMI. Therefore to hold that Textron is now the "insured" simply because it had a policy in effect when BMI caused the property damage in question, would not only be transforming the status of Textron on the basis of the actions of a then-unrelated third party but would also be misconstruing the insurance agreements. We refuse to do either.

We find Textron's argument that the "during the policy period" limitation applies only to after-acquired subsidiaries to be both circular and ambiguous. Textron admits that the "during the policy period" language applies to after-acquired subsidiaries of Textron but argues that it does not apply to Textron. Yet the only reason that this question is before us is that Textron acquired a subsidiary that had contaminated property prior to its acquisition. This is not a liability that an insured incurred. To claim liability against Textron itself, irrespective of any relationship to BMI, would be claiming liabil-

ity on the basis of no specific action of or relation to Textron.

Textron concedes that BMI was not a named insured during the periods of the policies under review. But for Textron's acquisition of BMI this case would not be before us. The liability that arises to Textron originates as a result of CERCLA, not out of the contractual relationship between Textron and Aetna. Textron's grievance is with the CERCLA legislation and not with the language of the insurance agreements.

Because this is a case of first impression for this court, we deem it fair play to review the extrajurisdictional cases that Textron relies on and to distinguish those cases from our holding. Textron places a mislaid reliance on *Boeing Co. v. Aetna Casualty and Surety Co.*, No. C86–352WD (W.D.Wash. October 16, 1991). In *Boeing* the court held an insurance company liable to defend and indemnify Boeing in connection with Boeing's liability for its dumping of toxic waste. *Id.* at 3. Consequently Boeing was responsible for an action that it performed. In contrast, Textron had no connection to the actions of BMI that caused the property damage, or to the property itself, during the period that the policies under review were in effect. Relying upon this important premise, we find that the *Boeing* decision is distinguishable.

Likewise, Textron's reliance on *Garriott Crop Dusting Co. v. Superior Court of Kern County*, 221 Cal.App.3d 783, 270 Cal.Rptr. 678 (1990), can be similarly distinguished. In *Garriott* the insureds brought suit against their insurers to defend against claims brought by the city of Bakersfield, California, to recover for contamination to adjacent land caused by Garriott's operations. *Id.* at 786, 270 Cal.Rptr. at 679. The discriminating factor again is that Garriott's activity caused the property damage. Therefore, *Garriott* is not persuasive.

Textron also filed a notice of supplemental authority to bring our attention to a recent Massachusetts Supreme Judicial Court opinion. Unfortunately for Textron, it is distinguishable for the same reasons that *Boeing* and *Garriott* are. In *Trustees of Tufts University v. Commercial Union Insurance Co.*, 415 Mass. 844, 846, 616 N.E.2d 68, 70 (1993),

the insured was sued by the owners of a parcel of land for the cleanup costs of environmental contamination pursuant to CERCLA. The current owner of the property sought reimbursement for the cost of cleaning up the contamination that had been caused during the time Tufts owned or operated the site. *Id.* at 848, 616 N.E.2d at 71.

In contrast, Textron seeks reimbursement for the cost of cleaning up contamination at the BMI site caused by a release of hazardous substances by BMI during a time when Textron had no relationship to the site or to the polluter. Therefore the *Tufts* decision is not persuasive. Additionally we need not distinguish other cases relied upon by Textron as we deem them either not applicable or unpersuasive.

We note that as of January 1, 1979, the section of the insurance policy defining the named insured was amended to delete the temporal-limitation language. As of that date the named-insured section was reformed to read as follows: "Textron Inc. and all subsidiary corporations and all partnerships in which Textron Inc. or its subsidiaries *have* more than 50% ownership interest." (Emphasis added.) Textron avers that the use of the present tense in the named-insured clause highlights an ambiguity. We do not agree.

"[L]ike most policies of insurance, [this policy] is written in the present or future tense." (Emphasis added.) *Aetna Life and Casualty Co. v. Carrera*, 577 A.2d 980, 984 (R.I.1990). We are not persuaded that such a large number of policies express ambiguity based simply on the tense of words employed. We do not share Textron's narrow interpretation of the impact of the use of the present tense in a policy's language. "A policy is not to be described as ambiguous because a word is viewed in isolation or a phrase is taken out of context." *McGowan v. Connecticut General Life Insurance Co.*, 110 R.I. 17, 19, 289 A.2d 428, 429 (1972). The amended named-insured language does not affect our holding.

Textron requests that we find that the scope of Aetna's insurance coverage is coextensive with Textron's liability for the clean-

up costs under CERCLA. The language of the policies does not support that contention. The fundamental principle that we rely on is that BMI was not related to Textron in any manner during the policies' periods under review. Consequently, since BMI was not a named insured under the insurance agreements, we conclude that coverage does not exist. Therefore, the trial justice correctly granted the summary-judgment motion.

Consequently, for the aforementioned reasons, the plaintiff's appeal is denied and dismissed. The judgment of the Superior Court is affirmed, and the papers of this case are remanded to the Superior Court.