UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1721

ST. PAUL FIRE AND MARINE INSURANCE COMPANY,

Plaintiff-Appellee,

v.

WARWICK DYEING CORPORATION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Torruella, Cyr and Boudin,

Circuit Judges.

Thomas M. Reiter with whom David M. Jones, John M. Edwards,

Linda E. Presson, Kirkpatrick & Lockhart, Nicholas Gorham,

Edmund L. Alves II and Gorham & Gorham were on brief for

appellant.
Michael Rubin, Assistant Attorney General and Environmental

Advocate, Office of the Attorney General, and Jeffrey B. Pine,

Attorney General of Rhode Island, on brief for State of Rhode
Island, amicus curiae.
Louis V. Jackvony III on brief for Town of North Smithfield,

amicus curiae.
John F. Bomster, John A. Tarantino, W. James McKay,

Victoria M. Almeida, W. Mark Russo, Sherry A. Giarrusso, Adler

Pollock & Sheehan Incorporated and Andrew C. Spacone on brief for

Textron, Inc., amicus curiae.
Kimball Ann Lane with whom Craig R. Brown, Anne T. Turilli,

Julie B. Pollack, Roger D. Brown, Adams, Duque & Hazeltine,

James T. Murphy and Hanson, Curran, Parks & Whitman were on brief

for appellee.

-2-

Laura A. Foggan, Lon A. Berk, Celiza P. Braganca and Wiley,

Rein & Fielding on brief for Insurance Environmental Litigation

Association, amicus curiae.

June 22, 1994

-3-

TORRUELLA, Circuit Judge. This case concerns the oft-

litigated pollution exclusion clause commonly found in general

liability insurance policies. Insurance coverage under this

clause, or the lack thereof, has engendered bitter and frequent

disputes between insurance companies and policyholders facing

some form of environmental liability. We enter the fray secure

in the knowledge that, regardless of our holding, we will have

followed a sizeable number of the courts that have considered the

issue. Upon our own consideration of the pollution exclusion

clause as applied to the specific facts of this case, we cast our

lot with those courts narrowly construing the breadth of coverage

afforded under the clause. We thus affirm the district court's

order of summary judgment in favor of plaintiff-appellee.

I. BACKGROUND

Plaintiff-appellee, St. Paul Fire and Marine Insurance

Company ("St. Paul"), brought this action in the district court

to obtain a declaratory judgment that St. Paul had no obligation

under an insurance contract issued to the defendant, Warwick

Dyeing Corporation ("Warwick"), to defend or indemnify Warwick

for claims arising from environmental damages at the Landfill &

Resource Recovery Superfund Site in North Smithfield, Rhode

Island (the "L&RR landfill" or the "Site"). St. Paul asserted in

its complaint that, among other things, the pollution exclusion

clause of the insurance policy barred coverage for contamination

at the L&RR landfill after Warwick arranged for the disposal of

its waste materials at the Site.

-3-

A. The Claims

Warwick is in the business of dyeing, finishing and

coating synthetic and synthetic-natural fiber blend fabrics. In

July of 1979, Warwick hired ACME Services, Inc. ("ACME"), a duly

licensed waste hauler, to collect, haul away, and dispose of

various waste materials generated by Warwick's West Warwick

plant. The waste contained certain hazardous substances. ACME

hauled the waste to the L&RR Site, also duly licensed, and

disposed of it in the landfill. One ACME truck driver stated in

an affidavit that he discharged waste directly into the landfill

by opening a drain valve on his truck and letting the waste pour

onto the ground. There is no evidence, however, that Warwick

knew where or how ACME disposed of its waste materials.

Furthermore, no party or governmental agency has alleged that

Warwick or ACME improperly discharged Warwick's waste materials.

On September 18, 1989, the United States Environmental

Protection Agency ("EPA") notified Warwick that it had determined

Warwick was a "potentially responsible party" ("PRP") under the

Comprehensive Environmental Response, Compensation and Liability

Act ("CERCLA"), 42 U.S.C. 9601 et seq., with respect to

contamination at the L&RR Site. The EPA stated that the L&RR

Site experienced releases and threatened releases of hazardous

substances requiring the EPA to undertake cleanup activities for

which the PRP's could be held liable pursuant to Sections 104,

106(a) and 107(a) of CERCLA. 42 U.S.C. 9604, 9606(a) &

9607(a).

-4-

The EPA noted that "responsible parties" include

"persons who arranged for disposal of hazardous substances found

at the site." Under CERCLA, a person that generates hazardous

substances and arranges for their disposal is strictly liable,

regardless of whether the person was at fault or whether the

substance actually caused or contributed to any damage, for all

costs of remediating environmental damages at the site where the

substances ultimately are disposed. See Dedham Water Co. v.

Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1150-56 (1st Cir.

1989); O'Neil v. Picillo, 883 F.2d 176, 177-83 (1st Cir. 1989),

cert. denied, 493 U.S. 1071 (1990).

The EPA alleged that Warwick was a "responsible party"

at the L&RR Site because it had arranged, "by contract agreement,

or otherwise," for the "disposal" of hazardous substances at the

L&RR Site. The EPA demanded reimbursement of the response costs,

mainly for investigation and monitoring, that it had incurred and

planned to incur at the Site.

On June 29, 1990, the EPA issued an administrative

order, pursuant to 104(e) & 106(a) of CERCLA, 42 U.S.C.

9604(e) & 9606(a), against twenty five respondents, including

Warwick, demanding that the respondents perform certain remedial

activities at the L&RR Site. The order alleged that Warwick

"arranged for the disposal of water soluble dye and fibers

containing acids and VOCS [volatile organic compounds], which

were disposed of at the Site." According to the EPA, the

hazardous substances at the L&RR Site had been poured directly

-5-

into the landfill or deposited in drums into the landfill. The

EPA's order documented the results of an investigation showing

that "the landfill continues to release Hazardous Substances to

the environment." The EPA made no allegations, however, that

waste was improperly disposed of or discharged at the Site or

that the landfill was improperly maintained. In fact, no

specific cause of the contamination was mentioned beyond the fact

that the named respondents disposed of waste at the Site. The

EPA ordered that respondents undertake various remedial

activities to monitor and prevent the further release of

hazardous substances and to reimburse the EPA for its previous

and future actions at the Site.

On July 25, 1991, a group of fourteen plaintiffs that

were also named by the EPA as PRPs at the L&RR Site filed suit

against Warwick and forty-six others for recovery of past and

future response costs incurred at the Site. The suit asserted

that Warwick was jointly and severally liable for having

"arranged for the disposal of hazardous substances" at the site.

Subsequent to the filing of this suit, Warwick entered into a

settlement agreement with the plaintiffs under which Warwick paid

$40,000 and assigned its rights under the St. Paul insurance

policies to the plaintiffs.

During the EPA's actions and the private lawsuit,

Warwick notified St. Paul, its general liability insurance

carrier, that it was seeking defense costs, and possibly,

indemnity coverage for the claims made by the EPA and the private

-6-

plaintiffs. St. Paul denied that coverage existed under the

applicable insurance policies for the claims against Warwick and

eventually brought this action to obtain an enforceable

declaration of noncoverage.

B. The Insurance Contract

St. Paul issued a series of "Comprehensive General

Liability Policies" ("CGL" policies) to Warwick that provided

Warwick with continuous coverage from 1971 through 1985 for

general commercial risks.

The insurance policies provided:

The Company [St.Paul] will pay on behalf
of the Insured [Warwick] all sums which
the Insured shall become legally
obligated to pay as damages because of:

Coverage A.: bodily injury or
Coverage B.: property damage

to which this insurance applies, caused
by an occurrence, and the Company shall
have the right and duty to defend any
suit against the insured seeking damages
on account of such bodily injury or
property damage even if any of the
allegations of the suit are groundless,
false or fraudulent, . . .

The policies thus provided coverage for property damage

caused by an "occurrence" which the policies defined as:

an accident, including continuous or
repeated exposure to conditions, which
results in bodily injury or property
damage neither expected nor intended from
the standpoint of the insured.

Following this insuring clause was a list of exclusions

from coverage, including the pollution exclusion at issue here

(the "exclusion"). Although the policies varied from year to

-7-

year, the following is representative of the language of the

exclusion:

It is agreed that the insurance does not
apply to bodily injury or property damage
arising out of the discharge, dispersal,
release or escape of smoke, vapors, soot,
fumes, acids, alkalis, toxic chemicals,
liquids or gases, waste materials or
other irritants, contaminants or
pollutants into or upon land, the
atmosphere or any watercourse or body of
water.

The exclusion contained an exception (the "exception") which

stated:

This exclusion does not apply if such
discharge, dispersal, release or escape
is sudden and accidental.

St. Paul filed its action on January 27, 1991. In

response to motions for summary judgment made by both parties,

the federal magistrate recommended that the district court enter

a judgment in favor of St. Paul. The magistrate held that the

pollution exclusion barred coverage for Warwick's claims because

the discharge of pollutants at the L&RR Site was neither "sudden"

nor "accidental" as required by the exception to the exclusion.

The district court initially issued an order on March 18, 1993,

adopting this recommendation. On the same day, Warwick moved for

reconsideration in light of "newly discovered evidence" regarding

representations made to state insurance regulatory authorities

about the meaning of the pollution exclusion clause. The

district court responded by recalling its order and vacating the

judgment. After additional briefing, however, the court again

adopted the magistrate's recommendation and, on June 4, 1993,

-8-

entered a judgment for St. Paul.

II. CONSTRUCTION OF THE INSURANCE CONTRACT

We review the district court's interpretation of St.

Paul's insurance contract de novo, LaSorsa v. Unum Life Ins. Co.,

955 F.2d 140, 146 (1st Cir. 1992); CPC Int'l, Inc. v. Northbrook

Excess & Surplus Ins. Co., 962 F.2d 77, 91 (1st Cir. 1992), to

determine if Warwick's claims are excluded from coverage as a

matter of law.

Rhode Island law governs the construction of the

insurance policy in this case. To interpret contested terms of

an insurance policy under Rhode Island law, the "policy must be

examined in its entirety and the words used must be given their

plain everyday meaning." McGowan v. Connecticut Gen. Life Ins.

Co., 289 A.2d 428, 429 (R.I. 1972); see also Textron, Inc. v.

Aetna Casualty and Surety Co., 638 A.2d 537, 539 (R.I. 1994);

Malo v. Aetna Casualty and Surety Co., 459 A.2d 954, 956 (R.I.

1983). "[W]hen the terms of an insurance policy are found to be

clear and unambiguous, judicial construction is at an end. The

contract terms must be applied as written and the parties bound

by them." Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550, 551

(R.I. 1990) (citing Malo, 459 A.2d at 956); Hughes v. American

Universal Ins. Co., 423 A.2d 1171, 1173 (R.I. 1980). Language

that is found to be ambiguous or capable of more than one

reasonable interpretation will be construed liberally in favor of

the insured and strictly against the insurer. Bartlett v. Amica

Mut. Ins. Co., 593 A.2d 45, 47 (R.I. 1991) (citing Streicker, 583

-9-

A.2d at 552); Pressman v. Aetna Casualty and Surety Co., 574 A.2d

757, 759-60 (R.I. 1990). However, a "policy is not to be

described as ambiguous because a word is viewed in isolation or a

phrase is taken out of context. A court should not, through an

effort to seek out ambiguity when there is no ambiguity, make an

insurer assume a liability not imposed by the policy." McGowan,

289 A.2d at 429; see also Textron, 638 A.2d at 539, 541;

Bartlett, 593 A.2d at 47; Streicker, 583 A.2d at 552.

To our knowledge, no Rhode Island court has interpreted

or discussed the pollution exclusion clause at issue in this

case. We therefore decide this case according to the

aforementioned principles of contract construction under Rhode

Island law with guidance from the collected wisdom of other

courts applying similar principles of insurance contract

interpretation.

Finally, although the parties agree that insurance

companies bear the burden of proving that a policy exclusion bars

coverage of a claim, the parties disagree over who bears the

burden of proving whether or not an exception to the exclusion,

such as the "sudden and accidental" exception at issue here,

affords coverage in a particular case. Warwick argues that

because the exception is part of the exclusionary clause, St.

Paul must prove that the exception applies as well. See New

Castle County v. Hartford Accident & Indemnity Co, 933 F.2d 1162,

1182 (3d Cir. 1991) (finding that the burden of proof is on the

insurer under Delaware law), cert. denied, 113 S. Ct. 1846

-10-

(1993). The last time we considered this issue, we stated that

the insured bears the burden of establishing that an exception to

a pollution exclusion provision has been satisfied. A. Johnson &

Co. v. Aetna Casualty & Surety Co., 933 F.2d 66, 76 n.14 (1st

Cir. 1991) (citing 19 G. Couch, Couch on Insurance 79: 385 (2d

ed. 1983)) (applying Maine law).

We think that the Supreme Court of Rhode Island would

agree with our position in A. Johnson. Once the insurer has

established that the pollution exclusion applies, coverage

depends on the applicability of the exception. Because the

insured bears the burden of establishing coverage under an

insurance policy, it makes sense that the insured must also prove

that the exception affords coverage after an exclusion is

triggered. Northern Insurance Co. v. Aardvark Assocs., Inc., 942

F.2d 189, 194-95 (3d Cir. 1991); Fireman's Fund Ins. Cos. v. Ex-

Cell-O Corp., 702 F. Supp. 1317, 1328-29 (E.D.Mich. 1988); Borg-

Warner Corp. v. Insurance Co. of N. Am., 577 N.Y.S.2d 953, 957

(N.Y. App. Div. 1992). We find, therefore, that Warwick bears

the burden of establishing that the discharge of its waste was

"sudden and accidental" under the exception to the pollution

exclusion.

III. THE POLLUTION EXCLUSION

The pollution exclusion clause of the St. Paul-Warwick

insurance policies bars coverage for "property damage arising out

-11-

of the discharge, dispersal, release or escape"1 of pollutants

of waste materials unless the discharge is "sudden and

accidental" (emphasis added). The issue before us is whether the

district court erred in finding that the discharge of Warwick's

wastes at the L&RR landfill was neither sudden nor accidental and

thus not covered under the policies.

State and federal courts are fairly evenly divided over

the meaning and application of the "sudden and accidental"

exception to the pollution exclusion clause. See, e.g., CPC

Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 962 F.2d 77,

92 (1st Cir. 1992) (reprinting two footnotes from New Castle, 933

F.2d at 1195, listing 24 cases holding that the pollution clause

bars coverage and 26 cases holding the opposite).2 Most courts

part company on the issue of whether the term "sudden" is

ambiguous -- in which case the policy is construed in the

insured's favor to provide coverage -- or unambiguous, in which

case insurance coverage is usually barred. Because most cases

involve some kind of gradual release of pollutants into the

environment over an extended period of time, courts finding a bar

to coverage under the exclusion have construed "sudden" as

1 We hereinafter employ the term "discharge" to refer to the
phrase, "discharge, dispersal, release or escape" in the
pollution exclusion.

2 Amicus for St. Paul, Insurance Environmental Litigation

Association, provides a list of 74 state and federal cases
holding that the term "sudden" in the pollution exclusion clause
clearly has a temporal meaning that favors insurers. We do not
doubt for a minute that there are another 74 cases holding that
the term is ambiguous, which favors the insureds.

-12-

unambiguously meaning "abrupt" or "immediate." E.g., Hartford

Accident & Indem. Co. v. U.S. Fidelity & Guar. Co., 962 F.2d

1484, 1487-90 (10th Cir.), cert. denied, 113 S. Ct. 411 (1992);

Aetna Casualty & Surety Co. v. General Dynamics Corp., 968 F.2d

707, 710 (8th Cir. 1992); A. Johnson, 933 F.2d at 72-74;

Aardvark, 942 F.2d at 191-94; Ogden Corp. v. Travelers Indemnity

Co., 924 F.2d 39, 42 (2d Cir. 1991); FL Aerospace v. Aetna

Casualty & Surety Co., 897 F.2d 214, 219 (6th Cir.), cert.

denied, 498 U.S. 911 (1990); Dimmitt Chevrolet, Inc. v.

Southeastern Fidelity Ins. Corp., No. 78293, 1993 WL 241520, at

*1-5 (Fla. July 1, 1993); Hybud Equip. Corp. v. Sphere Drake Ins.

Co., 597 N.E.2d 1096, 1100-03 (Ohio 1992), cert. denied, 113 S.

Ct. 1585 (1993); Upjohn Co. v. New Hampshire Ins. Co., 476 N.W.2d

392 (Mich. 1991); Lumbermens Mutual Casualty Co. v. Belleville

Industries, Inc., 555 N.E.2d 568, 572-73 (Mass. 1990); Waste

Management of Carolinas, Inc. v. Peerless Ins. Co., 340 S.E.2d

374, 381-83 (N.C. 1986); Borg-Warner, 577 N.Y.S.2d at 957; Mays

v. Transamerica Ins. Co., 799 P.2d 653, 657 (Or. App. 1990).

Courts construing the exception to the exclusion as affording

coverage for gradual discharges of pollutants have found that

"sudden" could reasonably mean "unintended and unexpected."

E.g., New Castle, 933 F.2d at 1193-1203; Morton Int'l, Inc. v.

General Accident Ins. Co., 629 A.2d 831, 847-876 (N.J. 1993);

Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204,

1210, 1217-21 (Ill. 1992); Hecla Mining Co. v. New Hampshire Ins.

Co., 811 P.2d 1083, 1091-92 (Colo. 1991); Claussen v. Aetna

-13-

Casualty & Surety Co., 380 S.E.2d 686, 688-89 (Ga. 1989). Even

this Circuit has split over the meaning of "sudden and

accidental" in the application of different state laws. Compare

CPC Int'l, 962 F.2d at 91-98 (finding "sudden" ambiguous), with

Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc., 938 F.2d

1423, 1429-30 (1st Cir. 1991) (finding "sudden" unambiguous),

cert. denied, 112 S. Ct. 969 (1992); A. Johnson, 933 F.2d at 72-

74 (same); Great Lakes Container Corp. v. National Union Fire

Ins. Co., 727 F.2d 30, 33-34 (1st Cir. 1984) (same).

This case, however, can be decided without determining

whether "sudden" is ambiguous or unambiguous. Despite the deep

divisions in their holdings, almost all courts agree, and the

parties to this case agree as well, that the term "sudden and

accidental," means, at the very least, "unintended and

unexpected." E.g., CPC Int'l, 962 F.2d at 91-98; Hartford, 962

F.2d at 1488; New Castle, 933 F.2d at 1192-99; Upjohn, 476 N.W.2d

at 392; Hecla, 811 P.2d at 1091-92. In other words, intentional

and expected discharges of pollutants are not covered under

policies with the standard pollution exclusion. Because we agree

with the district court that the discharge of pollutants was not

unintended and unexpected in this case, we uphold the summary

judgment order on that ground without reaching the issue of

whether the term "sudden," as used in the policy, is ambiguous.

Certain facts of this case are not in dispute. Warwick

purposefully arranged to have its waste materials collected and

hauled off its property. Those materials were disposed of in the

-14-

L&RR landfill. At the same time, Warwick presumed that its

wastes were disposed of lawfully and properly. It neither

expected nor intended that contamination of the environment would

result from the disposal of its wastes.

The district court found that Warwick's arrangement for

ACME to dispose of its waste in the regular course of business

was sufficient to establish that the relevant discharge was

"intentional and expected" and thus not "accidental." On appeal,

Warwick argues that the district court erred in attributing

Warwick's act of generating the waste and arranging for its

disposal with ACME's act of discharging the waste at the L&RR

Site. Additionally, Warwick contends that the court erred in

finding the relevant discharge to be the disposal of waste at the

landfill instead of the subsequent escape of pollutants from the

landfill into the surrounding environment. We reject both

arguments.

A. Arranging for discharge versus making the discharge

Warwick maintains that the pollution exclusion does not

apply when the discharges are made by a third party, such as a

waste hauler like ACME. Rather, Warwick argues, the relevant

discharge must be one by the insured itself. Because ACME, and

not Warwick, discharged this waste in this case, Warwick

concludes that no discharge has occurred that would trigger the

pollution exclusion to begin with. This argument has previously

been rejected by a number of courts. See Aardvark, 942 F.2d at

194; United States Fidelity & Guar. Co. v. George W. Whitesides

-15-

Co., 932 F.2d 1169, 1170-71 (6th Cir. 1991); Polaroid Corp. v.

Travelers Indem. Co., 610 N.E.2d 912, 916 (Mass. 1993); Powers

Chemco, Inc. v. Federal Ins. Co., 548 N.E.2d 1301, 1302 (N.Y.

1989); Borg-Warner, 577 N.Y.S.2d at 958; see also A. Johnson, 933

F.2d at 72 n.9 (noting that the pollution exclusion "does not by

its terms take account of an insured's status as a passive

polluter").

While it is true that the act of arranging for a third

party to haul away one's waste is not in and of itself any kind

of discharge upon land, that fact is irrelevant to the question

of whether the discharge from which the pollution damage arose

was expected or intended. The plain and unambiguous language of

the pollution exclusion concerns "property damage arising out of

the discharge," not "its discharge" or "the insured's discharge."

We thus see nothing in the policy to indicate that the exclusion

is limited to discharges by the insured. See, e.g., Park-Ohio

Indus., Inc. v. Home Indemnity Co., 975 F.2d 1215, 1222 (6th Cir.

1992); Aardvark, 942 F.2d at 194; Borg-Warner, 577 N.Y.S.2d at

958.

Contrary to Warwick's assertions, there is no

meaningful distinction in this case between arranging for waste

to be hauled off for disposal and actually disposing of the waste

in a landfill. For purposes of the exclusion, neither action was

unexpected or unintended by Warwick.3 Although Warwick did not

3 There is strong disagreement among the parties and, not
surprisingly, among the courts, over the issue of whether the
discharge must be unintended and unexpected from the standpoint

-16-

know the particular site where its waste would be disposed, and,

indeed, the record does not reveal whether Warwick actually knew

that its waste would be deposited in a landfill to begin with

(presumably, Warwick intended and expected that its wastes were

being "taken care of" without knowing any specific details of

their disposal),4 we think this case provides every indication

that the disposal of waste in the L&RR landfill was, at the very

least, not unexpected or unintended.

The relevant inquiry is not confined to whether Warwick

actually knew or planned that the discharge would occur.

Instead, the relevant inquiry, according to the language of the

exception to the pollution exclusion -- "this exclusion does not

of the insured or from the standpoint of some other party who is
more closely connected to the actual discharge of the waste. As
this issue does not affect our holding, we proceed under the
assumption that the relevant point of view is that of the
insured, Warwick. We do not decide, however, whether this is in
fact the proper construction of the contract.

4 In a September 14, 1988, letter to the EPA, Warwick's
President stated: "It was believed by the writer that the liquid
waste was to be carried to a waster-water [sic] sewage treatment
facility since the waste was acceptable to the West Warwick Sewer
System." The language of this statement indicates that Warwick
never bothered to find out, or even to inquire about, where its
waste was going. It does not indicate that Warwick was told that
ACME would bring its waste to a sewage treatment facility or that
disposing of its waste in a landfill was against Warwick's
intentions. Moreover, this statement indicates that Warwick did
not intend for its waste to be handled in any particular fashion
beyond merely dumping it down the sewer. Notations on the L&RR
manifests, recording ACME's disposal of Warwick's waste at the
landfill, state that, "this product normally goes to [the] sewer.
This is the sludge that collects on the bottom [of Warwick's
waste pit]." The disposal of the waste into a landfill was
consistent with Warwick's normal treatment of the waste -- a
general disposal into the normal sanitation infrastructure. In
light of this fact, ACME's discharge of Warwick's waste into the
landfill could not be viewed as unexpected or unintended.

-17-

apply if such discharge . . . is sudden and accidental" -- is

whether the discharge is "accidental," meaning "unexpected or

unintended." Coverage is only afforded if the discharge is

neither expected nor intended. "The courts are practically

agreed that the words 'accident' and 'accidental' mean that which

happens by chance or fortuitously, without intention or design,

and which is unexpected, unusual and unforeseen." Aetna Casualty

& Surety Co. v. General Dynamics Corp., 968 F.2d 707, 710 (8th

Cir. 1992) (quoting St. Paul Fire & Marine Ins. Co. v. Northern

Grain Co., 365 F.2d 361, 364 (8th Cir. 1966)).

We think it would strain common sense to find that

ACME's disposal of Warwick's waste in a landfill was unexpected

or unintended by Warwick. A landfill is a sufficiently common,

if not likely, destination for the disposal of waste. We see no

error in presuming that a party arranging to have its waste

disposed of by a licensed hauler would not find it fortuitous,

unforeseen, unusual, or otherwise contrary to its expectations

that its waste was disposed of at a landfill. This is not a case

where ACME did something surprising or out of the ordinary with

the waste after collecting it from Warwick. ACME did not dump

the waste in a river or at an illegal dumping ground. Despite

the affidavit from an ACME driver stating that waste was poured

directly onto the ground, the EPA and private party suits against

Warwick allege no wrongdoing or improper dumping at the Site.

The essence of the EPA's letter and order is that the property

damage at the Site arose as a result of hazardous substances

-18-

being placed in the landfill to begin with; there is no

intermediate event of discharge that Warwick can point to as

being unexpected or unintended from its standpoint.

B. The Relevant Discharge at the L&RR Landfill

Warwick argues that even if the disposal of its wastes

at the L&RR Site was intended and expected, this was not the

relevant discharge under the pollution exclusion clause. Warwick

claims that after the disposal of its waste, some subsequent

unexpected and unintended release of hazardous substances at the

Site occurred which led to the damage in this case. The issue of

whether the proper object of Warwick's intentions and

expectations is the disposal of waste materials at the Site or

some other discharge of pollutants is resolved by reference to

the contract. The language of the pollution exclusion is clear

that coverage does not exist for "property damage arising out of

the discharge" of waste materials or other pollutants "into or

upon land" unless "such discharge . . . is sudden and

accidental." Clearly, the occurrence that must be sudden and

accidental -- or, for our purposes, unintentional and unexpected

-- is the discharge of pollutants "into or upon land" from which

the property damage arose.

It is well established that whether the damages were

intended or expected is irrelevant; the pollution exclusion

plainly refers to the discharge and not to the environmental

damages themselves. A. Johnson, 933 F.2d at 72 (1st Cir. 1991);

Patz v. St. Paul Fire & Marine Ins. Co., No. 93-2135, 1994 WL

-19-

27280 (7th Cir. Feb. 2, 1994); Anaconda Minerals Co. v. Stoller

Chemical Co., 990 F.2d 1175, 1179 (10th Cir. 1993); Liberty

Mutual Ins. Co. v. Triangle Industries, Inc., 957 F.2d 1153,

1157-58 (4th Cir.), cert. denied, 113 S. Ct. 78 (1992); Broderick

Investment Co. v. Hartford Accident & Indem. Co., 954 F.2d 601,

606-07 (10th Cir.), cert. denied, 113 S. Ct. 189 (1992); New

Castle, 933 F.2d at 1169, 1199-1202 & n.68; Morton Int'l, Inc. v.

General Accident Ins. Co., 629 A.2d 831, 847-48 (N.J. 1993);

Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.,

555 N.E.2d 568, 571 (Mass. 1990); Technicon Electronics Corp. v.

American Home Assurance Co., 542 N.E.2d 1048, 1050-51 (N.Y.

1989).5 On the facts before us, the relevant discharge is the

disposal of the waste into the landfill, not some other

unspecified occurrence.

The EPA and the private complainants allege that

Warwick is liable for cleanup and other response costs at the

L&RR Site because Warwick arranged for the disposal of waste at

the Site. In essence, the EPA's order, as well as the subsequent

5 For the same reason, it is not relevant whether or not Warwick
actually knew that its waste materials contained hazardous
substances. Independent Petrochemical Corp. v. Aetna Casualty &

Surety Co., 781 F. Supp. 9, 16-17 (D.D.C. 1991), aff'd, 995 F.2d

305 (D.C. Cir. 1993), same finding on this issue in later

proceeding, 842 F. Supp. 575, 584-85 (D.D.C. 1994); Anaconda

Minerals Co. v. Stoller Chemical Co., 773 F. Supp. 1498, 1506

(D.Utah 1991), aff'd, 990 F.2d 1175 (10th Cir. 1993). The

exclusion bars coverage so long as the discharge of "waste
materials" was expected and intended and as long as the property
damage is "arising out of" this discharge. On this latter point,
the EPA's claim that Warwick's waste contained acids and volatile
organic compounds which contributed to the contamination of the
Site was sufficient to trigger the pollution exclusion.

-20-

lawsuit based upon the EPA's actions, state that waste containing

hazardous substances was placed in the L&RR landfill and, as a

result, the environment surrounding the landfill was contaminated

and faced the risk of continued contamination unless remedial

measures were taken to shore up the landfill. No cause of the

contamination, other than the fact that hazardous substances were

placed in the landfill, is mentioned in the order or in the

complaint.

According to these facts, the "property damage" at

issue is the contamination of the environment at the L&RR Site as

well as the condition of the landfill itself, which threatens

future contamination. As a result, the relevant discharge from

which the damage arose is clearly the disposal of waste

containing hazardous substances into the landfill. There is no

intermediate discharge onto the land causing the damage to the

environment. This is not a case involving ruptured or exploding

tanks, leaking drums, or even some sort of improper dumping of

waste after its arrival at the Site. Although the record

contains an affidavit from one of ACME's drivers stating that he

dumped waste directly onto the ground, the EPA and the other

claimants make no allegation that any improper disposal of wastes

occurred at the L&RR Site that might have been unexpected or

unintended. In sum, because there is no evidence of any

intervening discharge between the disposal of waste on the

landfill and the actual damage that eventually resulted, the

initial disposal of waste at the Site was the relevant discharge

-21-

which must be sudden and accidental for coverage to exist under

the exception to the pollution exclusion. See, e.g., Broderick,

954 F.2d at 607; Hartford, 962 F.2d at 1490-92; Aardvark, 942

F.2d at 194-96; A. Johnson, 933 F.2d at 72; Triangle Indus., 957

F.2d at 1157-58; Oklahoma Pub. Co. v. Kansas City Fire & Marine

Ins. Co., 805 F. Supp. 905, 910 (W.D.Okla. 1992); G. Heileman

Brewing Co. v. Royal Group, Inc., 779 F. Supp. 736, 740 (S.D.N.Y.

1991), aff'd, 969 F.2d 1042 (2d Cir. 1992); Hybud, 597 N.E.2d at

1103; Liberty Mutual Ins. Co. v. SCA Services, Inc., 588 N.E.2d

1346, 1350-51 (Mass. 1992); Borg-Warner, 577 N.Y.S.2d at 957-58;

Mays, 799 P.2d at 657.

Warwick argues that the damage in this case arose from

the release of pollutants from the landfill into the surrounding

environment -- a discharge that was neither expected nor

intended. To put it another way, the relevant discharge for

purposes of the pollution exclusion was the escape of hazardous

substances from a state of containment at the L&RR landfill into

or upon the land outside the confines of the landfill. Warwick

highlights the EPA statement that "the landfill continues to

release Hazardous Substances to the environment." At the very

least, Warwick asserts, the language of the pollution exclusion

is ambiguous as to the meaning of "discharge" in this context

where several possible releases exist. See, e.g., Patz v. St.

Paul Fire & Marine Ins. Co., No. 93-2135, 1994 WL 27280, at *3-5

(7th Cir. Feb. 2, 1994); F.L. Aerospace v. Aetna Casualty &

Surety Co., 897 F.2d 214, 220 (6th Cir. 1990); Nestle Foods Corp.

-22-

v. Aetna Casualty & Surety Co., 842 F. Supp. 125, 131-32 (D.N.J.

1993); Pepper's Steel & Alloys, Inc. v. United States Fidelity &

Guar. Co., 668 F. Supp. 1541, 1549 (S.D.Fla. 1987); Queen City

Farms, Inc. v. Central Nat'l Ins. Co., 827 P.2d 1024 (Wash. App.

1 Div. 1992); United States Fidelity & Guar. Co. v. Specialty

Coatings Co., 535 N.E.2d 1071, 1075-77 (Ill. App. 1 Dist. 1989).

We reject Warwick's argument as merely an attempt to

recast the damages in this case as a separate discharge. As

previously noted, the contract is clear that what must be sudden

and accidental is the discharge and not the resulting damages.

The damage in this case is the contamination of the environment

by hazardous substances disposed of in the landfill. This

environmental damage is essentially coterminous with the so-

called "release" of hazardous substances from the landfill to the

environment. To describe such releases as a separate event

constituting an independent discharge would eviscerate the

important distinction established between intentional and

expected damages and intentional and expected discharges. See

Broderick, 954 F.2d at 607 ("[The insured] tries to shift the

focus to the second discharge and attempts to graft an intent

requirement related to damages onto the unambiguous language of

the policy's exclusion clause. However, whether [the insured]

intended the waste to seep into groundwater and cause damage

after the initial discharges into the land is not relevant.")

(emphasis in original). Thus, the fact that Warwick did not

intend or expect the environmental damage at the L&RR Site is

-23-

irrelevant. What matters is whether the initial discharge "into

or upon land" that led to the damage is expected or intended;

"only the initial release is relevant to the 'sudden and

accidental' inquiry." A. Johnson, 933 F.2d at 72 & n.9; see,

e.g., Hartford, 962 F.2d at 1491; Oklahoma Pub., 805 F. Supp. at

910; Heileman, 779 F. Supp. at 740.

Warwick and its amici insist that the landfill is some

type of container, like a storage tank, which did not discharge

its contents into the environment until some unforeseen,

unexpected releasing event occurred. Nothing in the record

supports this contention that the L&RR landfill was a containment

vessel such that discharges into it would not constitute a

discharge "into or upon land." The EPA did state that the

landfill "releases" hazardous substances "to the environment,"

but this simply describes the property damage resulting from the

discharge of waste into the landfill. There is no indication the

EPA considered the landfill to be a containment vessel from which

hazardous substances escaped. To the contrary, the object of the

EPA's concern in its 87 page order is the fact that hazardous

substances were placed in the L&RR landfill to begin with, not

the failure of the landfill to contain wastes or the failure of

some party to properly operate and maintain the landfill.

We are not presented with a situation like the one

recently discussed by Judge Posner in Patz, where the insured

intended its disposal pit to serve as a containment vessel due to

its clay bottom. Patz, No. 93-2135, 1994 WL 27280, at *3-5. In

-24-

that case, Judge Posner found cause to believe there may have

been a separate unexpected discharge of pollutants subsequent to

the placement of waste into the pit. The waste in this case,

however, was removed from its containers on Warwick's premises

and placed into the landfill -- literally onto the land -- where

it later caused contamination. We presume all parties involved

expected this to be an acceptable practice, but we see no

evidence that the landfill itself was expected to act as a

containment vessel. See Broderick, 954 F.2d at 607 n.5

(rejecting contention that "containment ponds" that may have been

lined with cement could serve as a container preventing the

discharge of waste into them from being a discharge "into or upon

land" such that the pollution exclusion applied only when

substances were subsequently released from the ponds into the

surrounding environment). We therefore reject Warwick's

contention that there exists some unexpected and unintended

discharge of its wastes triggering the exception to the pollution

exclusion. Instead, we agree with the district court to the

extent it found the pollution exclusion applicable because

Warwick's discharge of waste was expected and intended and thus

not "accidental."

IV. REGULATORY ESTOPPEL ARGUMENT ESTOPPED

Warwick argues that St. Paul should be estopped or

barred from applying the pollution exclusion to the facts of this

case because of alleged representations that were made by various

parties to state insurance regulatory authorities. See Morton

-25-

Int'l, Inc. v. General Accident Ins. Co., 629 A.2d 831, 870-76

(N.J. 1993). This argument was never made before the district

court. "It has long been the rule of this circuit that arguments

not made initially to the district court cannot be raised on

appeal." Kale v. Combined Ins. Co., 861 F.2d 746, 755 (1st Cir.

1988); see, e.g., Vanhaaren v. State Farm Mut. Auto. Ins. Co.,

989 F.2d 1, 4-5 (1st Cir. 1993).

Warwick claims that it raised the estoppel issue when

it argued:

In short, the insurance industry was able
to obtain approval of the pollution
exclusion clause by labelling it merely a
"clarification" that would not change
coverage for pollution claims. This
Court should treat the clause
accordingly.

This statement hardly raises the issue of estoppel for the

district court's consideration. Warwick's statement was made in

conjunction with Warwick's submission to the court of various

materials relating to representations made before the state

insurance regulatory board. The submissions and motions all

related to the argument that the insurance contract was ambiguous

and should be interpreted in favor of Warwick. No claim of

estoppel was made at the time. Consequently, the issue is

waived.

We find no "egregious circumstances" or "miscarriages

of justice" that would allow us to transgress our rule against

raising issues for the first time on appeal. Kale, 861 F.2d at

755. Furthermore, this case presents no other special

-26-

circumstances, such as an issue which "the district court

expressly and unequivocally addressed" or an "an ongoing

injunction, constraining part of a governmental program," that

might otherwise give us the authority to decide the issue.

Trailer Marine Transport Corp. v. Rivera V zquez, 977 F.2d 1, 6

(1st Cir. 1992).

V. MOTIONS DELAYED AND MOTIONS DENIED

Apparently unsatisfied with the argumentation presented

in their briefs and in the briefs of various amici, the parties

in this case have filed a huge batch of additional motions and

materials in this case. As a consequence, we received more

paperwork after the case was briefed and argued than we did

before argument. Because the majority of this deluge is either

superfluous, moot, or flaunts even a liberal application of our

rules concerning page limits and the proper subject matter for

motions and other filings, we deny most of the motions and strike

many of the other filings.

For the record, we deny the motion for certification

and grant St. Paul's motion to strike Warwick's supplemental

brief in support of certification. St. Paul's motions to strike

extrinsic materials or alternatively expand the record are moot

as we found no cause to consider the extrinsic materials.

Warwick's motion to strike St. Paul's effusive filing on the

Nestle case is granted. We deny St. Paul leave to file responses

and replies to various reply briefs and to Warwick's opposition

to St. Paul's motion to strike extrinsic evidence. In the

-27-

alternative, we grant Warwick's motion to strike St. Paul's

responses and replies. Lest we neglect the amici, we deny amicus

Textron's motion to file a reply to several other amicus briefs

and we find that St. Paul's motion to strike material in

Textron's brief is moot. Finally, we deny Mid-America Legal

Foundation permission to file an amicus brief and we grant

Warwick's motion to strike Aetna's amicus brief.

We affirm the district court's order of summary

judgment and dispose of all other motions as described above.

-28-